**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 21, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

No. 06-2187

JOSE ANTONIO COS,

Defendant-Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR 05-1619 JB)**

David M. Walsh, Assistant United States Attorney for the District of New Mexico (David Iglesias, United States Attorney), with him on the briefs, for the Plaintiff-Appellant.

Margaret A. Katze, Assistant Federal Public Defender, Albuquerque, New Mexico, for the Defendant-Appellee.

Before **HENRY**, **ANDERSON**, and **GORSUCH**, Circuit Judges.

**HENRY,** Circuit Judge.

A federal grand jury indicted Jose Antonio Cos on one count of being a felon in possession of a firearm, a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). In response, Mr. Cos filed a motion to suppress the primary evidence in the case, a gun found in the bedroom of his apartment during a June 29, 2005 search by Albuquerque police officers. Mr. Cos contended that Feather Ricker, a nineteen-year-old friend, whom he had left in his apartment with three young children, lacked actual or apparent authority to consent to the search. The district court agreed, granting Mr. Cos's motion and then denying the government's motion to reconsider, which argued that the evidence should be admitted pursuant to the good faith exception to the exclusionary rule.

The government now appeals. Examining the evidence in the light most favorable to Mr. Cos and accepting the district court's factual findings because they are not clearly erroneous, see United States v. Nielson, 415 F.3d 1195, 1198 (10th Cir. 2005), we conclude that Mr. Cos's friend lacked actual or apparent authority to consent to the search and that the good faith exception to the exclusionary rule is inapplicable. We therefore affirm the district court's rulings.

## I. BACKGROUND

### A. The Search of Mr. Cos's Apartment

On June 3, 2005, Albuquerque police received a report from Krista Shepard that Mr. Cos, her ex-boyfriend, had confronted her outside her apartment,

brandished a knife, and threatened to kill her and her new roommate. She told Mr. Cos that she would call the police, and he fled.

Based on Ms. Shepard's statement, Albuquerque Police Detective Chase Mayhew obtained an arrest warrant for Mr. Cos. Detective Mayhew attempted to contact Mr. Cos by telephone but was unsuccessful. On June 29, 2005, more than three weeks after receipt of Ms. Shepard's report, seven Albuquerque police officers arrived at Mr. Cos's apartment at approximately 3:00 p.m. to serve the arrest warrant. Feather Ricker, Mr. Cos's nineteen-year-old friend, answered the door.

Ms. Ricker testified at the hearing on the motion to suppress that she had known Mr. Cos for about a month, that they were "[r]eally good friends" who were "[j]ust getting to know each other," and that they would "go out sometimes." Aplt's App. vol. II, at 250. She also testified that she never had a key to Mr. Cos's apartment, that she was not living there, that she did not pay the rent, and that her name was not on the lease. Before June 29, 2005, Ms. Ricker had been alone in the apartment once or twice, when Mr. Cos went to the store, and she had spent the night there on two or three occasions. However, she did not keep any of her personal belongings in the apartment. Ms. Ricker added that she lived at another apartment complex and that Mr. Cos did not help her financially.

Earlier that day, Ms. Ricker had asked Mr. Cos for permission to bring her four-year-old nephew and two other young children to the apartment so that they could use the swimming pool there. Mr. Cos had agreed: he picked up Ms. Ricker and the children, drove them to his apartment, and left. Ms. Ricker and the children had been alone in the apartment for about forty minutes when the officers arrived.

When Ms. Ricker answered the door to Mr. Cos's apartment on June 29, the following conversation ensued:

| [Albuquerque Police Officer Paul Pryde]: | Are you guys the only ones at home? |
|---|---|
| [Ms. Ricker]: | Yeah, me and my kids. |
| [Officer Pryde]: | Is Jose here? |
| [Ms. Ricker]: | Jose, no. |
| [Officer Pryde]: | Has he ever been here? |
| [Ms. Ricker]: | Like earlier today, yeah, but . . . . " |
| [Officer Pryde]: | Can we take a look? |
| [Ms. Ricker]: | Yeah, go for it. |

Aplt's App. vol. I, at 42 (Mem Op. and Order, quoting Transcript of Taped Interview, at 1). Before entering, the Albuquerque police officers did not ask Ms. Ricker who she was or what relationship she had to Mr. Cos or his apartment.

After the officers entered, they noticed that Ms. Ricker was cooking ground beef on the stove in the kitchen. Two children were watching a movie, and a third child came out from the bedroom. According to Sergeant John Guilmette, the third child kept looking back towards the bedroom. When she started to return there, Sergeant Guilmette stopped her. Believing that someone else was in the bedroom, he drew his weapon and entered. He and other officers then searched the bedroom and the bathroom. Under the bed, Sergeant Guilmette found a gun and a holster. He announced the discovery to the other officers and decided to request a search warrant.

The officers proceeded to contact the apartment complex's management to determine whose name was on the lease. They learned that Mr. Cos's name was the only one listed.

Next, Detective Mayhew asked Ms. Ricker a series of questions: if she lived in the apartment, if Mr. Cos had left her in charge, and if Mr. Cos had allowed her to stay there. Ms. Ricker described Mr. Cos as her ex-boyfriend and told Detective Mayhew that, on June 29, she "just came to visit." Aplt's App. vol. I, at 44. She added that she was "[n]ot in charge. [Mr. Cos] said he was gonna go get us . . . ." Id. Additionally, she denied that Mr. Cos had allowed her and the children to stay in the apartment, stating, "We just came to come, you know, swimming." Id. After confirming that Mr. Cos knew that Ms. Ricker was in the

apartment while Mr. Cos was out, Detective Mayhew declared: "That makes you the agent of this property." Id. Ms. Ricker replied, "Uhuh." Id.

Two hours after the police first knocked on the door, Ms. Ricker and the children left the apartment. Detective Mayhew also left, seeking to obtain a search warrant. Later that afternoon, Detective Mayhew returned with the warrant. Mr. Cos arrived at about the same time, and the officers arrested him.

The police officers searched Mr. Cos's apartment and found $500 and a scale. They also interviewed Mr. Cos. He told them that he had been dating a girl that lived with him, whom he had known for about thirty-five days. Later, during the same interview, Mr. Cos stated that the girlfriend had been living at his apartment for approximately three months and had a key to his apartment. During the interview, neither Mr. Cos nor the officers mentioned Ms. Ricker by name, and the government does not now contend that Ms. Ricker was the girlfriend to whom Mr. Cos referred.

### B. The District Court Proceedings

In July 2005, a federal grand jury charged Mr. Cos with being a felon in possession of a firearm, a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). In response, Mr. Cos moved to suppress the evidence found during the search of the apartment. The district court conducted a hearing and then granted Mr. Cos's motion.

-6-

The court first rejected the government's contention that the arrest warrant authorized the police officers' initial entry into the apartment. The court concluded that the officers lacked a reasonable belief that Mr. Cos was present in the apartment when Ms. Ricker answered the door. Notably, the United States does not challenge that conclusion on appeal.

The court also concluded that Ms. Ricker lacked actual authority to consent to the search under either standard set forth in the controlling Tenth Circuit precedent: (a) "mutual use of [the apartment] by virtue of joint access," or (b) "control for most purposes over it." United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999). Under the first standard, mutual use by virtue of joint access, the court noted Ms. Ricker's testimony that (1) she did not have a key to Mr. Cos's apartment; (2) she could thus not enter the apartment without his consent; (3) she had to ask permission for the children to come over; and (4) she did not leave any of her personal belongings at the apartment when she left. "The facts indicate that she was more like an occasional visitor whom [Mr.] Cos allowed to visit, rather than one who asserted a right to access the property jointly with [Mr.] Cos." Aplt's App. vol. I, at 62. As to the second standard for actual authority, control over the apartment, the district court observed that Ms. Ricker had only known Mr. Cos for thirty-five days, that she did not pay rent, and that she did not have her name on the lease. Also, Ms. Ricker and Mr. Cos did not have the kind of relationship from which control could be presumed.

Next, the court held that Ms. Ricker lacked apparent authority. Because the officers did not ask Ms. Ricker about her relationship to the apartment or to Mr. Cos before asking for permission to search, the court said, they did not have a reasonable belief that Ms. Ricker had the authority to consent to the search. See United States v. Gutierrez-Hermosillo, 142 F.3d 1225, 1230 (10th Cir. 1998) (discussing the standard for apparent authority).

The government filed three motions to reconsider, arguing in part that, in light of the good faith exception to the exclusionary rule, the evidence should not be suppressed. The district court rejected that argument as well, applying circuit precedent holding that "the 'good-faith exception applies only narrowly, and ordinarily only where an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer.'" Aplt's App. vol. I, at 158 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)). Here, the court concluded, the mistake at issue—relying on Ms. Ricker's consent when she lacked actual or apparent authority—was made by the officers rather than by another party (e.g., a judicial officer issuing a warrant).

## II. DISCUSSION

On appeal, the government challenges the district court's grant of Mr. Cos's motion to suppress, arguing that Ms. Ricker had both actual and apparent authority to consent to the search of the apartment. In the alternative, the government

maintains that the district court erred in refusing to apply the good-faith exception to the exclusionary rule. As noted above, we view the record in the light most favorable to Mr. Cos and accept the district court's factual findings unless clearly erroneous. Nielson, 415 F.3d at 1198. However, we examine de novo the ultimate legal questions at issue: whether an officer's conduct violated the Fourth Amendment and whether the good faith exception applies. See United States v. Trotter, 483 F.3d 694, 698 (10th Cir. 2007) (reviewing de novo whether a third party had actual or apparent authority); United States v. Danhauer, 229 F.3d 1002, 1005 (10th Cir. 2000) (reviewing de novo whether the good-faith exception applies).

## A. Appellate Jurisdiction

Before addressing the merits, we must first consider whether we have jurisdiction over this appeal. The jurisdictional question concerns the date that the government filed its notice of appeal, June 29, 2006. As we have noted, before filing this notice, the government filed three unsuccessful motions to reconsider the district court's April 25, 2005 order granting Mr. Cos's motion to suppress.

Under 18 U.S.C. § 3731, which governs interlocutory appeals by the United States in criminal cases, the government must file a notice of appeal within thirty days of the decision from which it appeals. However, a timely motion for reconsideration tolls the thirty-day period until the district court rules upon that motion. See United States v. Ibarra, 502 U.S. 1, 6-7 (1991). Generally, the thirty-

day period is <u>not</u> tolled by a successive motion for reconsideration that raises the same issue as the first motion. <u>United States v. Cardall</u>, 773 F.2d 1128, 1130 (10th Cir. 1985); <u>United States v. Marsh</u>, 700 F.2d 1322, 1324-28 (10th Cir. 1983). "The reasoning behind the general rule is that the opposite interpretation would permit unlimited extensions of time to appeal. One party could theoretically postpone indefinitely the appeal of his adversary by filing motions for reconsideration, and the adverse party might die before having to pay off the judgment." <u>Id</u>. at 700 F.2d at 1326.

Here, Mr. Cos contends that we lack jurisdiction over this appeal because the government did not file its notice of appeal until June 29, 2006, which was more than thirty days after the district court denied the government's first two motions to reconsider. The government responds that the district court did not finally rule on its motions to reconsider until June 9, 2006. Because it filed its notice of appeal within thirty days of that later date, the government argues, its appeal is timely.

In analyzing this issue, we begin by summarizing the sequence of events following the district court's April 25, 2006 order granting Mr. Cos's motion to suppress. On April 26, 2006, the government filed its first motion to reconsider, arguing that Ms. Ricker had both actual and apparent authority to consent to the search. On the same day, Mr. Cos filed a motion to strike the government's

motion to reconsider, arguing that the government was improperly seeking to reargue its opposition to the motion to suppress.

On May 1, 2006, the government filed a supplemental motion to reconsider in which it: (a) contested the district court's finding that the officers did not know that children were in Mr. Cos's apartment until the officers entered; (b) argued that Ms. Ricker had apparent authority; and (c) argued, for the first time, that the motion to suppress should be denied pursuant to the good-faith exception to the exclusionary rule.

On May 4, 2006, the district court entered an order denying Mr. Cos's motion to strike the government's first motion to reconsider. The court explained that, "[t]here is no doubt that the Motion to Reconsider complicates matters, but it is not clear that it will significantly prolong this case or be inconsistent with judicial economy. If anything, correcting a mistake now will save the parties the time and expense of doing so at the appellate level." Aplt's App. vol. I, at 86.

Subsequently, on May 17, 2006, the district court entered an order granting in part and denying in part the government's first and supplemental motions to reconsider. The court found that "the police knew, before Feather Ricker gave consent for the police to search [Mr. Cos's] apartment, that there were children in the apartment." Id. at 89. However, the court reaffirmed its previous conclusion that Ms. Ricker lacked actual or apparent authority.

As to the government's argument regarding the good-faith exception to the exclusionary rule, the court began its discussion by stating in a heading that "[t]he court will not address the good-faith exception." Id. at 114. It explained that the government had not raised this issue in its initial brief opposing the motion to suppress or at the evidentiary hearing on the motion. "To consider such an argument at this late date, especially when the United States fails to explain in its supplemental motion why the exception applies to this case, would be unfair to [Mr.] Cos and promote a waste of judicial resources in allowing parties a second chance to argue that which they should have raised the first time." Aplt's App. vol. I, at 114-15.

Nevertheless, the court added that it "d[id] not see, on its own, without the benefit of any argument from the United States, why the good-faith exception would apply in this case." Id. at 115; see also id. at 116 (stating that "the mistake that led the police officers into [Mr.] Cos'[s] apartment . . . was one that they, not a neutral third party like a magistrate made"). Thus, the court concluded, "the good faith exception does not seem to apply in this case." Id. at 116. However, the court then stated, "If the United States truly believes that the good-faith exception may save the evidence from exclusion, it may file a motion setting forth its reasons with more particularity and specificity." Id.

The government quickly followed the district court's suggestion, filing a third motion to consider on the following day, May 18, 2006. On June 9, 2006,

the court entered an order denying the government's third motion to reconsider. On June 14, 2006, the court issued an opinion setting forth its reasoning in more detail. As noted above, the government filed its notice of appeal on June 29, 2006.

In light of these extensive proceedings on reconsideration, we must decide whether the thirty-day time to appeal under 18 U.S.C. § 3731 ran from the district court's May 17, 2006 order denying the government's first two motions to reconsider, as Ms. Cos contends, or whether, as the government contends, the thirty-day period began to run on June 9, 2006, when the court denied the government's third motion.

Under the particular circumstances at issue here, we agree with the government that the thirty-day period began to run on the later date. Our conclusion is based upon the language in the district court's May 17, 2006 order, which stated that the court would not consider the good-faith exception, then expressed only a tentative view on the issue (i.e. that "the good faith exception does not seem to apply in this case"), and invited the government to file a motion "setting forth its reasons [supporting application of the good-faith exception] with more particularity and specificity." Id. (emphasis added). That language suggests that the district court had not finally adjudicated the government's supplemental motion to reconsider insofar as it concerned the good-faith issue. See S. Ute Indian Tribe v. Amoco Prod. Co., 2 F.3d 1023, 1029 (10th Cir. 1993) (concluding that an order was not final because "the court itself viewed [the order] as

-13-

preliminary rather than final"); cf. United States v. Karo, 710 F.2d 1433, 1436 (10th Cir. 1983) (holding that the time for filing a notice of appeal ran from the entry of a written order rather than a preceding oral ruling and reasoning that "[t]he time allowed for appeal begins to run when the trial judge acts in a manner which clearly indicates his intention that the act shall be the final one in the case") (internal quotation marks and alterations omitted), rev'd on other grounds, 468 U.S. 705 (1984). As a result, the government's third motion for reconsideration, filed at the court's express invitation and raising the issue identified by the court, is distinguishable from the successive motions that we have deemed not to toll the time for filing a notice of appeal. See, e.g., Marsh, 700 F.2d at 1324-28 (holding that the defendant was "not entitled to two motions for rehearing," and that, as a result, the second motion did not toll the time for filing a notice of appeal).

Our conclusion that the May 17 order did not finally adjudicate the government's supplemental motion to reconsider (as to the good-faith issue) is supported by the principle that "[f]inality is determined on the basis of pragmatic, not needlessly rigid *pro forma*, analysis." Fiataruolo v. United States, 8 F.3d 930, 937 (2d Cir. 1993). Applying that principle, courts have held that, when it is not clear that a district court order has resolved an issue, the time for filing a notice of appeal runs from the subsequent order that unambiguously does so. See, e.g., O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1208-09 (10th Cir. 1992) (concluding that "we do not deem [a district court order] to be final for

-14-

purposes of appeal because further proceedings on the merits of [an issue] were plainly contemplated and the [appellants] were not clearly informed that the litigation on [the issue] had ended with nothing else remaining for court action"); Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1231 n.2 (3d Cir. 1991) (holding that when an order "was inadequate to inform defendant of the proper avenue of appeal," the time for filing the notice of appeal ran from a subsequent order that "rectified" "this confusion"). Here, at best, the May 17 order is ambiguous on the key question of whether it finally resolves the good-faith argument advanced by the government in its supplemental motion to reconsider. Absent "some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as it is concerned, is the end of the case," Fiataruolo, 8 F.3d at 937, we do not believe that May 17 order started the clock running against the government.

Our conclusion is also supported by considerations of judicial economy. Because the district court indicated that it was open to further consideration of the government's argument regarding the good-faith exception, the government's filing of the invited motion, without first filing a notice of appeal, allowed the issue to be fully developed by the district court before it was raised on appeal. Cf. Cardall, 773 F.2d at 1330-31 (concluding that when the district judge suggested that the government file a second motion for reconsideration based on a recent Supreme Court decision and defer filing an appeal, the second motion for

reconsideration tolled the time for filing a notice of appeal and stating that: "[the district court's] perception of judicial economy correctly indicated the wise course of deferring an appeal until [it] had time to reconsider the issue so that this court could properly review the matter in its full context"). Further and quite importantly, the government did not tarry, acting on the court's invitation to file a third reconsideration motion the very next day, and thus minimizing delay.

As both the dissent and Mr. Cos observe, the Supreme Court's recent decision in Bowles v. Russell, 127 S. Ct. 2360, 2366 (2007) informs us that "timely filing of a notice of appeal in a civil case is a jurisdictional requirement[,]" and "[the courts] ha[ve] no authority to create equitable exceptions to jurisdictional requirements."[1] In Bowles, the Court held that "the Court of Appeals lacked jurisdiction to entertain an appeal filed outside the 14-day window allowed by [28 U.S.C. § 2107] but within the longer period granted by the District Court." Id. at 2363. Here, however, the question is not whether the district court had authority to extend the thirty-day period for filing notice of appeal under 18 U.S.C. § 3731, but rather whether that period began to run on May 17, 2006 or June 9, 2006. Bowles does not address the question, and, for the reasons stated above, we conclude that time for filing the notice of appeal did not begin to run

---

[1] Mr. Cos submitted a Fed. R. App. P. 28(j) letter informing the court of the Bowles decision.

until June 9, 2006, when the district court finally ruled on the government's good-faith argument and denied its third motion to reconsider.[2]

We therefore conclude that the government's appeal is timely, and we proceed to the merits of the case.

### B. Merits

A warrantless search of a suspect's home is per se unreasonable under the Fourth Amendment unless the government can show that it falls within "one of a

---

[2] Admittedly, the oft-filed "motion for reconsideration" has dubious parameters. Many district courts vigorously disfavor these motions. Judge Wayne Alley has "note[d] with dismay the alarming practice and regularity with which motions to reconsider are filed after a decision unfavorable to a party's case" and asked whether "there [is] some misapprehension widely held in the bar that our court, in ruling on a motion after it is fully briefed, is just hitting a fungo[.]" See Wayne E. Alley, Letter and Attached Order, 62 OKLA. B. J. 108, 109 (1991). "Many of the motions," Judge Alley continues, "have as their tenor: 'Aw come one, give us a break,' or 'You ruled against us so *ipso facto* you were wrong,' or 'You just didn't understand the issue,' or its variant 'You are just so stupid that you didn't understand the issue.'" Id.

Nevertheless, courts sometimes grant reconsideration motions, and sometimes reconsider reconsideration motions. See, e.g., Jensen v. Snellings 636 F. Supp. 1305, 1307 (E.D. La. 1986) (granting a second motion to reconsider), aff'd in part and rev'd in part on other grounds, 841 F.2d 600 (5th Cir. 1988). Here, we believe that the district court's invitation to the government indicated that it had not finally decided the issue, and that, although the court suggested that the government had a tough row to hoe, the government could continue to pursue the good-faith exception argument.

The dissent eloquently (and equitably) advances the other view. We agree that "the parties *generally* get only one bite at the [motion for reconsideration] apple." Dissent at 5 (quoting Charles L.M. v. NE. Indep Sch. Dist., 884 F.2d 869, 871 (5th Cir. 1989)) (emphasis added). In our view, this case is one of the exceptions that probes that rule. Had the district court indicated, in its May 17 order, that it had finally decided the good faith issue, this would be a different case.

carefully defined set of exceptions." Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971). That general principle reflects a central value of the Fourth Amendment: "a man's home is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown." Georgia v. Randolph, 126 S. Ct. 1515, 1524 (2006) (alternations in original) (internal quotation marks omitted). "We have . . . lived our whole national history with an understanding of [that adage]." Id.; see also Wilson v. Layne, 526 U.S. 603, 610 (1999) (noting the "centuries-old principle of respect for the privacy of the home"). This court has often affirmed that view. See, e.g., United States v. McCullough, 457 F.3d 1150, 1163 (10th Cir. 2006) ("'It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'") (quoting Payton v. New York, 445 U.S. 573, 586 (1980)); United States v. Hatfield, 333 F.3d 1189, 1196 (10th Cir. 2003) (stating that "privacy in the interior of a home and its curtilage are at the core of what the Fourth Amendment protects"); United States v. Waupekenay, 973 F.2d 1533, 1536 (10th Cir. 1992) (observing that the defendant had "a heightened expectation of privacy when he was within his trailer" because "[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home") (alternations and internal quotation marks omitted).

Consensual searches constitute one exception to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Kimoana,

-18-

383 F.3d 1215, 1221 (10th Cir. 2004). Consent may be obtained from the individual whose property is searched, or in certain instances, from a third party who possesses either actual authority or apparent authority to consent to the search. See United States v. Matlock, 415 U.S. 164, 169-72 (1974) (discussing actual authority); Illinois v. Rodriguez, 497 U.S. 177, 186-89 (1990) (discussing apparent authority); Kimoana, 383 F.3d at 1220-1223 (applying both doctrines). The government has the burden of proving that the consenting party had such authority. See United States v. McAlpine, 919 F.2d 1461, 1463 (10th Cir. 1990) (actual authority); Kimoana, 383 F.3d at 1222 (apparent authority).

Here, the government maintains that Ms. Ricker had both actual and apparent authority to consent to the search of Mr. Cos's apartment. We consider each argument in turn.

1. Actual Authority

    a. Matlock

The Supreme Court's decision in Matlock sets forth the test for actual authority. There, the Court held that a woman who jointly occupied with the defendant a bedroom in her mother's house could validly consent to a search of that bedroom. The Court explained that "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other

sufficient relationship to the premises or effects sought to be inspected." Matlock, 415 U.S. at 171. Under Matlock, "common authority" is not based on the law of property but rather on

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the cohabitants has the right to permit inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 171 n.7.

That language has led to varying formulations of the standard for determining a third party's actual authority to consent to a search. See Rith, 164 F.3d at 1329 & n.1 (discussing the varying approaches adopted by the circuits). For example, the D.C. Circuit has required proof of both mutual use and joint access. See id. at 1329-30 (discussing United States v. Whitfield, 939 F.2d 1071, 1074 (D.C. Cir. 1991)). The Second Circuit requires proof of (1) access to the area searched and (2) common authority over the area, a substantial interest in the area, or permission to gain access to the area. See id. at 1329 n.1 (discussing United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992)). In several cases, the Ninth Circuit has taken yet another approach, concluding that even if a third party lacked "joint access or control for most purposes," Matlock, 415 U.S. at 171 n.7, she or he may nevertheless validly consent to a search of the defendant's property if the defendant "assumed the risk that [the third party] would allow a search of the [property]." United States v. Kim, 105 F.3d 1579, 1583 (9th Cir. 1997); see also United States

v. Davis, 332 F.3d 1163, 1170 n.4 (9th Cir. 2003) (explaining that "[w]e have rarely applied the 'assumption of risk' analysis urged by the dissent, and the few cases in which we have done so have involved situations where the person whose property was searched clearly ceded authority over the property, either partially or totally, to the consenting third party"). The Seventh Circuit has also followed the "assumption of the risk" approach on occasion. See United States v. Cook, 530 F.2d 145, 149 (7th Cir. 1976) (stating that "because [the third parties] retained such broad control over the premises, we must recognize that [the defendant] had assumed the risk that they might permit others to inspect the premises").

### b. Rith—The Tenth Circuit's Reading of Matlock

In this circuit, we have read Matlock to establish the following standards for assessing actual authority to consent to a search of a residence: "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." Rith, 164 F.3d at 1329 (emphasis added). The first of these standards—mutual use by virtue of joint access—is "a fact-intensive inquiry." Id. at 1330. We require the government to show that "the third party entered the premises or room at will, without the consent of the subject of the search." Id.; see, e.g., McAlpine, 919 F.2d at 1464 (concluding that a women held in the defendant's home against her will had actual authority to consent to a search because she had resided in the home for two months, regularly slept in the back bedroom where the guns were found and kept her personal possessions throughout the trailer, thus demonstrating "mutual access . . . and use [of the entire home] on a daily basis").

In contrast, the second standard—control for most purposes over the property—is a "normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party." Rith, 164 F.3d at 1330. If the presumption of control is not rebutted, then the third party has actual authority to consent to a search of the defendant's property. Id. Parent-child and husband-wife relationships trigger this presumption, but "a simple co-tenant relationship does not create a presumption of control and actual access would have to be shown." Id.

In applying these principles of actual authority, we must be mindful of the Supreme Court's recent observation that: '[t]he constant element in the assessing reasonableness in the consent cases . . . is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules." Randolph, 126 S. Ct. at 1521. Thus, whether the defendant's reasonable expectation of privacy was infringed by the third party's consent to the search is a paramount concern. See McAlpine, 919 F.2d at 1463 (observing that, "if [actual] authority is established, the person whose property is searched is unjustified in claiming an expectation of privacy in the property because that person cannot reasonably believe that the joint user will not, under certain circumstances, allow a search in her own right").

c. The government's arguments

Here, the government advances three challenges to the district court's ruling that Ms. Ricker lacked actual authority to consent to the search of his apartment. First, invoking a phrase from <u>Matlock</u>, it contends that, by allowing Ms. Ricker to use his apartment, Mr. Cos assumed the risk that she would consent to the search. Second, invoking another phrase from <u>Matlock</u>, the government maintains that Ms. Ricker had "a sufficient relationship" to the apartment to give consent. Finally, under the alternative standards set forth in <u>Rith</u>, the government contends that Ms. Ricker had both (a) mutual use of the apartment by virtue of joint access; and (b) control over the apartment for most purposes.

The government's first two arguments are not supported by the law of this circuit. As Mr. Cos correctly notes, when determining whether a third party has actual authority to consent to the search of a residence, we do not apply an independent "assumption of the risk" or "sufficient relationship to the premises" test. Although those phrases do appear in <u>Matlock</u> and other courts have occasionally applied those concepts to find actual authority, <u>Rith</u> controls our reading of <u>Matlock</u>. Under <u>Rith</u>, neither the defendant's "assumption of the risk" nor the existence of a "sufficient relationship" between the third party and the premises frames the inquiry.

We acknowledge that our recent decision in <u>United States v. Trotter</u>, 483 F.3d 694 (10th Cir. 2007) does employ one of the concepts invoked by the government—a "sufficient relationship to the premises"—in concluding that a third party had actual authority to consent to a search. In <u>Trotter</u>, the defendants

conspired with a third party, Mr. King, to possess and distribute illegal drugs. As part of the conspiracy, Mr. King, acting under the direction of one of the defendants and using that defendant's funds, rented a storage unit in his own name. The defendants kept the keys to the storage unit, but on numerous occasions they gave Mr. King a key so that he could retrieve drugs and drug paraphernalia from the unit. Citing a Ninth Circuit decision involving similar facts, United States v. Kim, 105 F.3d 1579 (9th Cir. 1997), we held that Mr. King had actual authority to consent to a search of the storage unit by the police.

In reaching this conclusion, we reasoned that because Mr. King had leased the storage unit in his own name, "he could at any time have exercised his rights as lessee to have the storage company open the unit, without [the defendant's] knowledge or permission." Trotter, 483 F.3d at 699. Moreover, the defendants had "allowed Mr. King access to the storage unit when they sent Mr. King to the unit to retrieve and drop off items." Id. Accordingly, "Mr King's position as a lessee of the unit and his active participating in renting and using the facility gave him a 'sufficient relationship to the premises' to justify the searches based upon his consent." Id. (emphasis added).

Despite its application of the "sufficient relationship to the premises" language from Matlock, our opinion in Trotter does not support a departure from the standard we announced in Rith for determining actual authority in this case. Most importantly, this case, like Rith and unlike Trotter, involves the search of a home. Given the heightened protection afforded to the home under the Fourth

-24-

Amendment, see e.g., Wilson, 526 U.S. at 610, we are convinced that Rith's more precise formulation of the standard applies here.

Applying the Rith standard for actual authority, we are not convinced by the government's arguments. The government maintains that Ms. Ricker had joint access to the apartment because she had used it in the past and because, on the day of the search, Mr. Cos had left her alone there. According to the government, the record also establishes the alternative standard for actual authority—control for most purposes. As to that standard, the government asserts, Ms. Ricker had "an established personal relationship" with Mr. Cos and thus Mr. Cos had no "expectation of exclusive access" to the apartment. Aplt's Br. at 16-17. For support, the government observes that Ms. Ricker had slept in Mr. Cos's bedroom on previous occasions and, on the day of the search, had gone through the bedroom where the gun was found in order to use the bathroom.

The government's argument regarding the first alternative Rith inquiry—mutual use of the property by virtue of joint access—completely ignores our statement that the government must show that the third party "entered the premises or room [that was subjected to the search] at will, without the consent of the subject of the search." Rith, 164 F.3d at 1330 (emphasis added). Here, Ms. Ricker testified at the evidentiary hearing that she did not have a key to the apartment, and the district court expressly found that "the United States has not established that [Ms.] Ricker had, in fact, a key to the apartment." Aplt's App. vol. I, at 62. Moreover, Ms. Ricker also testified that she could not enter the apartment

without Mr. Cos's consent and that she had to ask for his consent to invite other people over, like the children who came to the apartment to swim on the day of the search. Thus, like the district court, we conclude that Ms. Ricker could not enter the apartment without Mr. Cos's consent.

Moreover, as the district court also observed, there are additional facts indicating that Ms. Ricker "was more like an occasional visitor whom [Mr.] Cos allowed to visit, rather than one who asserted a right to access the property jointly with [Mr.] Cos." Id. Ms. Ricker did not leave her personal belongings in the apartment, but instead took them with her when she left, indicating that she could not come and go as she pleased. Further, she had only been alone in the apartment on two occasions before the day of the search, and each occasion was only for a brief period. Ms. Ricker's limited access to the apartment is therefore insufficient to demonstrate actual authority under the first Rith inquiry. See United States v. Warner, 843 F.2d 401, 403 (9th Cir. 1988) (affirming the district court's finding that a landlord lacked actual authority to consent to a search of a tenant's property because "at best, the landlord had permission to enter the property for the limited purpose of making specified repairs and occasionally mowing the lawn"); United States v. Corral, 339 F. Supp. 2d 781, 791-92 (W.D. Tex. 2004) (holding that a part-time housekeeper lacked actual authority to consent to a search of the defendant's residence because she "enjoyed only limited access to the residence," "was present for specific and limited purposes only," did not have a key, and never let others into the house nor had permission to do so); see also United States v.

-26-

Salimonu, 182 F.3d 63, 76 (1st Cir. 1999) (Lipez, J., dissenting) (concluding, on an issue not reached by the majority, that a third party who had permission to enter the defendant's apartment solely for the purpose of facilitating the move of his possessions into storage lacked actual authority to consent to search of the apartment because "[a]ccess to the apartment for that limited purpose cannot be reconciled with the joint access or control for most purposes which is required for valid consent").

As to the second Rith inquiry—control over the apartment for most purposes—the government's argument is similarly unconvincing. The relationship between Ms. Ricker and Mr. Cos, who had dated for a short time and were friends (having "an established personal relationship," in the government's words), is not the equivalent of the relationships we recognized in Rith as establishing a presumption of control: those between parent and child and husband and wife. Rith, 164 F.3d at 1330. If, as we stated in Rith, co-tenant relationships do not establish a presumption that each party has control over the property for most purposes, we fail to see how this particular personal relationship should create such a presumption. See id.

Finally, the government's argument in support of Ms. Ricker's alleged control over the apartment is untethered to any persuasive account of "widely shared social expectations" or reasonable expectations of privacy that would support the view that, in the absence of a valid warrant or exigent circumstances, Mr. Cos somehow forfeited his right to exclude the government's entry into his

home by leaving Ms. Ricker alone there for forty minutes before the officers arrived. Randolph, 126 S. Ct. at 1521; McAlpine, 919 F.2d at 1463.

2. Apparent Authority

The government also challenges the district court's conclusion that Ms. Ricker lacked apparent authority to consent to the search. Even when actual authority is lacking, a third party has apparent authority to consent to a search if a police officer reasonably, but erroneously, believes that the third party has actual authority to consent. Randolph, 126 S. Ct. at 1520; Rodriguez, 497 U.S. at 181; United States v. Andrus, 483 F.3d 711, 716 (10th Cir. 2007). The apparent authority inquiry is an objective one: we must determine whether "the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premises[.]" Rodriguez, 497 U.S. at 188 (internal quotation marks and citations omitted); see also Gutierrez-Hermosillo, 142 F.3d at 1230 (stating that the inquiry is objective). In light our formulation in Rith, a third party has apparent authority if the officer has a reasonable belief that the third party has "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." See Rith, 164 F.3d at 1329.

Importantly, "where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." Kimoana, 383 F.3d at 1222 (10th Cir. 2004). Thus, the government cannot meet its burden of demonstrating a third party's apparent authority "if agents, faced with an

ambiguous situation, nevertheless proceed without making further inquiry." Id.

(internal quotation marks and citation omitted). As Professor LaFave writes,

"sometimes the facts known by the police cry out for further inquiry, and when this

is the case it is not reasonable for the police to proceed on the theory that

'ignorance is bliss.'" 4 Wayne R. LaFave, SEARCH AND SEIZURE § 8.3(g) at 180

(4th ed. 2004); see also id. at 177 (stating that "under a sound application of the

apparent authority rule the police must be required to make reasonable inquiries

when they find themselves in ambiguous circumstances").

Here, the government contends that because Ms. Ricker answered the door of

Mr. Cos's apartment at three o'clock in the afternoon and because the officers

realized that children were there, the officers reasonably believed that Ms. Ricker

had the authority to consent to the search. The government invokes the following

passage from the Supreme Court's decision in Randolph, which refers to the

Court's earlier decision in Matlock:

> Matlock accordingly not only holds that a solitary
> co-inhabitant may sometimes consent to a search of shared
> premises, but stands for the proposition that the
> reasonableness of such a search is in significant part a
> function of commonly held understanding about the
> authority that co-inhabitants may exercise in ways that
> affect each other's interests.

> Matlock's example of common understanding is
> readily apparent. When someone comes to the door of a
> domestic dwelling with a baby at her hip, as Mrs. Graff did,
> she shows that she belongs there, and that fact standing
> alone is enough to tell a law enforcement officer or any
> other visitor that if she occupies the place along with others,
> she probably lives there subject to the assumption tenants

> usually make about their common authority when they share quarters. They understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another.

Randolph, 126 S. Ct. at 1521 (emphasis added). The government also cites Commonwealth v. Hughes, 836 A.2d. 893, 901 (Pa. 2003). There, the Pennsylvania Supreme Court held that three teenage girls standing on an outside porch of the defendant-parolee's residence had apparent authority to consent to a search of that residence.

Again, we agree with the district court's thorough analysis rejecting the government's contentions. Even if accompanied by young children, a third party's mere presence on the premises to be searched is not sufficient to establish that a man of reasonable caution would believe that she had "mutual use of the property by virtue of joint access, or . . . control for most purposes over it." See Rith, 164 F.3d at 1329. Instead, the government must offer some additional evidence to support a claim of apparent authority.

That conclusion follows from our apparent authority decisions. For example, we recently held that a defendant's father had apparent authority to consent to the search of a computer located in the defendant's bedroom. Andrus, 483 F.3d at 721. We reasoned that the officers knew that the defendant's father owned the home and lived there with family members; that the father paid the internet and cable bill; that even though the computer was located in the defendant's bedroom, the defendant's father had access to the room at will; and finally, that "the officers saw

the computer in plain view on the desk in [the defendant's] room and it appeared available for use by other household members." Id. Similarly, in Kimoana, we based our holding that a third party had apparent authority to consent to the search of a motel room on the fact that a police officer knew that the third party had a key to the room and that he had told the officer that he had stayed there with his cousins. And in Guiterrez-Hermosillo, 142 F.3d at 1231, we concluded that the defendant's fourteen-year-old daughter, who answered the door of a motel room, had apparent authority to consent to the search of a motel room because border patrol agents had questioned the defendant on the previous day and knew that he and his daughter were traveling together.

Decisions from other circuits support the view that the government must offer more evidence than the third party's presence on the premises. For example, the Ninth Circuit has rejected the argument that "[a third party] had apparent authority to consent because he answered the front door and appeared to be alone in the apartment." United States v. Reid, 226 F.3d 1020, 1025 (9th Cir. 2000).

Other courts have also made it clear that, in ambiguous circumstances, officers must seek additional information in order to determine whether the third party has authority to consent to a search. For example, in United States v. Goins, 437 F.3d 644, 649 (7th Cir. 2006), the Seventh Circuit explained that officers had not "blindly accept[ed] [the defendant's girlfriend's] claim of authority over a premises in order to create apparent authority to search." Instead, upon questioning the girlfriend, the officers learned that she "had a key to the apartment [and]

-31-

possessions within the apartment[.]" Id. The girlfriend also "represented that she lived there on-and-off and frequently cleaned and did household chores in the home." Id. Similarly, in United States v. Meada, 408 F.3d 14, 21 (1st Cir. 2005), the First Circuit explained that "officers were not merely acting on an unsubstantiated hunch that [the defendant's girlfriend] had joint access to the apartment." Instead, before they entered the apartment, the defendant's girlfriend had told the officers that she kept several personal possessions there and that she could enter in the defendant's absence. See also United States v. Hudson, 405 F.3d 425, 442-43 (6th Cir. 2005) (holding that a third party had apparent authority to consent to a search of a home where the defendant lived because "the officers reasonably believed that [the third party] and [the defendant] were romantically involved and had a child; [the third party and the defendant] and the child lived with [the defendant's grandmother] . . . ; and [the third party] had a key to the home"); Harajli v. Huron Twp, 365 F.3d 501, 506 (6th Cir. 2004) (concluding that a third party had apparent authority to consent to the search of a house when she had lived there "in the recent past" and possessed a garage door opener, which she used to gain access to the house).

Here, in contrast, the officers who arrived at Mr. Cos's apartment on June 29, 2005, had no information about his living arrangements. Thus, when they encountered Ms. Ricker at the front door, they did not know who she was or what relationship she had to Mr. Cos or to the residence. As the district court reasoned, when an officer knocks on the door of an apartment at three o'clock in the

afternoon, the person who answers the knock could be a repairman, a visitor, or a neighbor watering the plants or feeding the pets. It was possible that Ms. Ricker was living there, but alternative explanations for her presence in the apartment were also plausible. Moreover, the fact that she told the officers that she was there with "my kids" does not resolve the ambiguity. For example, as the district court observed, the children could have belonged to a neighbor or a visiting non-resident relative. Thus, in many plausible scenarios, Ms. Ricker may well not have had either "mutual use of the property by virtue of joint access or . . . control for most purposes over it." See Rith, 164 F.3d at 1329.

The police officers who encountered Ms. Ricker at the door of Mr. Cos's apartment were therefore confronted with "an ambiguous situation." Kimoana, 383 F.3d at 1223. Because they "nevertheless proceed[ed] without making further inquiry," id., the government cannot meet its burden of establishing that "the facts . . . warrant[ed] a man of reasonable caution [to believe] that [Ms. Ricker] had authority over [Mr. Cos's apartment]." Rodriguez, 497 U.S. at 188.

Additionally, we disagree with the government that the Supreme Court's observations in Randolph are applicable here. Importantly, Randolph is not an apparent authority case. Instead, the decision involves "a straightforward application of the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." 126 S. Ct. at 1528. As noted above, Randolph describes the consenting third party in Matlock as "someone [who] comes to the door of a

-33-

domestic dwelling with a baby at her hip." Id. at 1521. However, that description does not purport to create a bright-line rule about the circumstances establishing apparent authority, as the government suggests. Instead, the Supreme Court explains that "if [the woman coming to the door with baby on her hip] occupies the place along with others, she probably lives there." Id. (emphasis added). Randolph thus addresses the "commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." Id. (emphasis added). Here, Mr. Cos and Ms. Ricker were not co-inhabitants.

In addition, unlike Ms. Ricker, the consenting third party discussed in this section of the Randolph opinion told the police that she lived in bedroom where the contraband was found before the police searched that location. See Matlock, 415 U.S. at 175 (stating that "Mrs. Graf responded to inquiry at the time of the search that she and [the defendant] occupied the east bedroom together" and that "[a] few minutes later, having led the officers to the bedroom, she stated that she and [the defendant] shared the one dresser in the room") (emphasis added). Thus, neither Randolph nor Matlock suggests that Ms. Ricker's being in Mr. Cos's apartment with children is sufficient to establish apparent authority.

The one other authority on which the government relies, the Pennsylvania Supreme Court's decision in Hughes, is also distinguishable. The defendant there was on parole when the search of the approved parole residence occurred. The Hughes court acknowledged that "a parolee has a diminished expectation of privacy[,] and the Fourth Amendment protections of a parolee are more limited

-34-

than the protections afforded the average citizen." Hughes, 836 A.2d at 899. More importantly, we are not bound by Hughes, and, to the extent that it is inconsistent with our cases regarding actual and apparent authority, we decline to follow it.

We therefore conclude that Ms. Ricker lacked apparent authority to consent to the search of Mr. Cos's apartment.

3. Good-Faith Exception

Finally, the government argues that the district court erred in refusing to apply the good-faith exception to the exclusionary rule. Citing the district court's observation that "there is no reason to doubt the police officers' good faith," Aplt's App. vol. I, at 116, the government maintains that even if this court concludes that the search of Mr. Cos's apartment violated the Fourth Amendment because Ms. Ricker lacked authority to consent, the evidence discovered there should still not be suppressed.

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court "adopted a good-faith exception and specifically applied that exception where 'an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope,' even though the search warrant was later declared invalid." Herrera, 444 F.3d at 1249 (quoting Leon, 468 U.S. at 920). In this circuit, we have concluded that "Leon's good faith exception applies only narrowly, and ordinarily only when an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer." Id.

Thus, in Herrera, we declined to apply the good faith exception when a state trooper conducted a random, warrantless inspection of a truck based on the officer's mistaken belief that the truck was a commercial vehicle subject to such inspections under state law. We did so despite the fact that the trooper was mistaken by only one pound in believing that the defendant's truck was a commercial vehicle subject to the state regulatory scheme. Id. at 1246; see also id. at 1254 (noting that "the *officer's* mistaken good-faith factual belief (not shared by the person being searched) that the vehicle being searched was a commercial vehicle subject to an administrative search") (emphasis in original).

Similarly, in United States v. Scales, 903 F.2d 765 (10th Cir. 1990), we declined to apply the good faith exception when officers seized a suitcase without a warrant. In our view, Leon did not apply "to cases in which the good faith of the officer cannot be presumptively established by the existence of a warrant valid on its face." Id. at 768.

Here, as the district court recognized, the officers' initial entry into Mr. Cos's apartment was based neither on a facially valid warrant nor on a mistake made by someone other than the officers. Instead, the officers proceeded into the apartment because of their mistaken belief that Ms. Ricker had the authority to consent. In such circumstances, the good faith exception to the exclusionary rule is inapplicable.[3]

---

[3]    We note that in a case not mentioned or argued by the government, the

(continued...)

-36-

In seeking to avoid this conclusion, the government relies primarily on

United States v. McClain, 444 F.3d 556 (6th Cir. 2006).  There, officers received a

phone call from a neighbor indicating that the owners of a nearby house had moved

out several weeks earlier and that there was a light on that had not been on before.

Finding the front door slightly ajar, the officers entered the house and found

evidence of a marijuana growing operation.  Based on that discovery, the officers

proceeded to obtain a search warrant, and executed it six weeks later.

The Sixth Circuit held that the officers initial warrantless entry into the

house violated the Fourth Amendment:  they lacked probable cause to believe that a

burglary was in progress and there were no other exigent circumstances to justify a

warrantless search.  However, the court further held that the officers who executed

---

[3](...continued)
Supreme Court has held that, when a particular kind of mistake is made by police officers themselves—a violation of the Fourth Amendment's knock-and-announce requirement— the exclusionary rule is not applicable.  United States v. Hudson, 126 S. Ct. 2159 (2006).  However, in our view, the Supreme Court's holding is based on considerations pertaining to the knock-and-announce requirement in particular rather than to other Fourth Amendment violations.  See id. at 2168 (noting "the social costs of applying the exclusionary rule to knock-and-announce violations" and stating that "the incentive to such violations is minimal to begin with," and that "the extant deterrences against [knock-and-announce violations] are substantial").  Justice Kennedy's opinion concurring in part and concurring in the judgment makes this very point, concluding that "the continued operation of the exclusionary rule is not in doubt" and that "[t]oday's decision determines only that in the specific context of the knock and announce requirement, a violation is not sufficiently related to the later discovery of evidence to justify suppression." Id. at 2170 (Kennedy, J., concurring).
         Accordingly, for other violations of the Fourth Amendment that are caused by officers' mistakes rather that by those of a third party, the good faith exception ordinarily remains inapplicable.  See Herrera, 444 F.3d at 1249.

the subsequent warrant had acted in good faith because the initial violation was "close enough to the line of validity to make the executing officers belief in the validity of the search warrant objectively reasonable." 444 F.3d at 566 (internal quotation marks omitted). Applying Leon's good faith exception, the court therefore concluded that the evidence obtained pursuant to the warrant should not have been suppressed.

Although we cannot follow McClain to the extent that it conflicts with the law of this circuit, we conclude that it is distinguishable nevertheless. In McClain, it was the officers' belief in the validity of the search warrant that triggered the application of Leon. The Sixth Circuit explained that "the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search, and [the] warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search." Id. Accordingly, there was nothing more that the officer could have done under the circumstances to insure that the search would be legal.

Here, the officers had an arrest warrant for Mr. Cos. However, the district court found that the arrest warrant did not justify the officers' entry into the apartment. See Aplt's App. vol. I, at 60 (concluding that "the officers lacked a reasonable belief that [Mr.] Cos would be found within the apartment" and that, as a result, "the entry into his apartment pursuant to the arrest warrant was not valid"). The government has not challenged this ruling on appeal. Absent the arrest warrant, the only other basis for the officers' entry into the apartment was Ms.

-38-

Ricker's response to "go for it." Aplt's App. vol. I, at 42. Thus, the government has not established that the evidence at issue was obtained in good faith reliance on a warrant.

We therefore conclude that the district court properly refused to apply the good-faith exception to the exclusionary rule.

### III. CONCLUSION

For the foregoing reasons, we therefore AFFIRM the district court's order granting Mr. Cos's motion to suppress.

06-2187, *United States v. Cos*

**GORSUCH, J.**, Circuit Judge, dissenting.

The court today confronts a number of difficult merits questions and resolves them with great care. I would hold, however, that we lack authority to entertain this appeal. The Supreme Court has instructed that congressionally imposed deadlines for filing a timely notice of appeal, like the one before us, are mandatory, jurisdictional, and not susceptible to equitable tolling. It recently emphasized this point by dismissing even the appeal of a habeas petitioner who filed a late notice of appeal in reliance on a federal court's mistaken calculation of the applicable deadline. In the case before us, the government urges various (and less persuasive) equitable reasons for permitting its own untimely notice of appeal. But the government surely should be held no less accountable to congressionally prescribed filing deadlines than a habeas petitioner. Accordingly, I respectfully dissent.

I

A handful of background facts are essential. On April 25, 2006, the district court granted Jose Antonio Cos's motion to suppress. The next day, the government filed a motion to reconsider, pursuing, as it had previously, the argument that Feather Ricker had actual and apparent authority to authorize the government's search. Before the district court was able to rule, the government filed, on May 1, 2006, a "supplemental motion to reconsider." In this pleading, the government raised two new arguments. First, it asked the district court to reconsider the applicability of *United States v. Matlock*, 415 U.S. 164 (1974). The district court

had distinguished *Matlock* from this case on the basis that the officers here did not know children were in the apartment at the time of their entry. In its motion to reconsider, the government cited record evidence suggesting the officers did have such knowledge. Second, the government asked the court – for the first time – to consider the potential application of the good-faith exception to the exclusionary rule.

Mr. Cos moved to strike the government's supplemental motion, expressing, among other things, a concern that the government was trying to extend the time for filing its notice of appeal unilaterally by introducing new arguments for reconsideration seriatim. On May 4, 2006, the district court denied Mr. Cos's motion to strike, indicating that "there is no sound reason for the Court not to consider" the government's good faith argument; it further indicated that, if the government was indeed seeking to extend the deadline for its notice of appeal as Mr. Cos charged, it was proceeding "at its own risk."

Finally, on May 17, 2006, the district court ruled on the government's motion and supplemental motion to reconsider. The court granted the government's motion in part solely to clarify that the officers knew children were present at the time they entered the apartment and to supplement its distinction of *Matlock*, thus responding on the merits to one of the government's supplemental arguments for reconsideration. In all other respects, however, the district court expressly denied the relief sought and held it would not vacate its controlling April 25, 2006, order granting Mr. Cos's motion to suppress "because the United States has not set forth a

sufficient ground for taking such a step." Mem. Op. at 8; *see also id.* at 29 ("The Court will not vacate its Memorandum and Order granting the motion to suppress.").

With specific reference to the government's argument for a good-faith exception to the application of the exclusionary rule, the district court refused to entertain it on the basis that it appeared in only two sentences in a supplemental filing and was not developed by the government: "To consider such an argument at this late date, especially when the United States fails to explain in its supplemental motion why the exception applies to this case, would be unfair to Cos and promote a waste of judicial resources in allowing parties a second chance to argue that which they should have raised the first time." *Id.* at 27-28. Indeed, the district court made this point very clear, stating in a bolded, capitalized heading: "**THE COURT WILL NOT ADDRESS THE GOOD-FAITH EXCEPTION**." *Id.* at 27. After holding that it would not rule on the good-faith issue, the district court added its view that the exception did not "seem to apply" on its own terms anyway and indicated that "[i]f the United States truly believes that the good-faith exception may save the evidence from exclusion, it may file a *motion* setting forth its reasons with more particularity and specificity." *Id.* at 29 (emphasis added).

On May 18, 2006, the government filed what it concedes was, and describes as, a second motion for reconsideration, providing a detailed argument about the applicability of the good-faith exception. *See* Gov't Br. at 4 ("The Second Motion to Reconsider Raised A New Argument"); *id.* at 7 (discussing "second motion to reconsider"). On June 9, 2006, after a hearing, the district court entered an order

denying the government's second motion. Twenty days later, on June 29, 2006, the government filed its notice of appeal.

II

Congress has governed by statute our jurisdiction over appeals taken by the United States from orders suppressing evidence, providing in pertinent part that "[t]he appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted." 18 U.S.C. § 3731. We have previously held this deadline to be jurisdictional in nature. *See United States v. Martinez*, 681 F.2d 1248, 1254 (10th Cir. 1982).[1] It is settled law that, when a party chooses to file a motion to reconsider, the deadline for filing a notice of appeal begins to run from the date of the order denying the motion. *See United States v. Ibarra*, 502 U.S. 1, 6-7 (1991). But it is equally settled in this circuit that a second or subsequent motion to reconsider has no effect on this calculus and will not toll the filing deadline. *See United States v. Marsh*, 700 F.2d 1322 (10th Cir. 1983). As we have explained, a party "is not entitled to two bites, so to speak." *Id.* at 1324. While the federal rules and longstanding practice recognize the propriety of an extension of time when an initial motion for reconsideration is pending, *see id.* at 1325, "no provision is made for additional

---

[1] Rule 4(b)(4) of the Federal Rules of Appellate Procedure authorizes a district court to extend the time to file a notice of appeal under certain circumstances. Whether Rule 4(b)(4) may trump or supplement Section 3731 may be a nice question, *see United States v. Sasser*, 971 F.2d 470, 473-75 (10th Cir. 1992), but it is one we need not address as the government does not contend that the conditions necessary for application of Rule 4(b)(4) are met here. *Id.*

consideration" in cases where a "double effort [i]s plain." *Id.* "[S]uccessive tolling

of the appeal period is not allowed." *Id.* (quoting *United States v. Rothseiden*, 680

F.2d 96, 98 (11th Cir. 1982)); *accord Glinka v. Maytag Corp.*, 90 F.3d 72, 74 (2d

Cir. 1996) (citing *Marsh* and collecting cases from the First, Fifth, Sixth, Seventh,

Eighth, and D.C. Circuits).  As our sister circuit has put the point:  "The interest of

finality requires that parties generally get only one bite at the [motion for

reconsideration] apple for the purposes of tolling the time for bringing an appeal."

*Charles L.M. v. Ne. Indep. Sch. Dist.*, 884 F.2d 869, 871 (5th Cir. 1989).[2]

Interpreting a similarly worded statute, 28 U.S.C. § 2107(c), which governs

the time to appeal from civil decisions of the district courts, the Supreme Court in

*Bowles v. Russell*, 127 S. Ct. 2360, 2362 (2007), recently underscored what it means

to recognize such deadlines as "jurisdictional."  After the district court's denial of

his writ of habeas corpus, Keith Bowles, the inmate-petitioner, had 30 days within

which to file a notice of appeal.  Mr. Bowles failed to do so but moved to reopen the

period during which he could file his notice of appeal pursuant to Rule 4(a)(6) of the

Federal Rules of Civil Procedure, which, subject to certain conditions, allows

district courts to extend the filing period for 14 days from the day the district court

grants the order to reopen.  The district court granted Mr. Bowles's motion, but,

---

[2]  Of course, as the court today indicates, district courts are free, if they wish, to entertain further motions for reconsideration. *See* Maj. Op. at 17 n.2.  The only question for us is when the time for a notice of appeal begins to run, and it is long settled that only an initial motion for reconsideration will toll that period; otherwise, of course, a party might delay appellate review indefinitely simply by filing motion after motion seeking reconsideration. *Id.*

rather than extending the filing period by 14 days, the court gave him 17 days to file his notice of appeal. In reliance on the district court's instruction, Mr. Bowles took 16 of the 17 days afforded him.

The Supreme Court held Mr. Bowles's appeal untimely, stating that Mr. Bowles's reliance on an (erroneous) direction of the district court mattered not at all. The filing day deadline, the Court held, was jurisdictional and mandatory in nature and no equitable consideration could overcome it – not even reliance on express, if erroneous, judicial direction. "If rigorous rules like the one applied today are thought to be inequitable," the Court held, it is "Congress" and not the judiciary that "may authorize courts to promulgate" exceptions softening their effect. *Bowles*, 127 S. Ct. at 2367.

Applying these principles to the case before us, I would hold the government's appeal untimely. The 30-day appellate clock began ticking, to my mind, on May 17, 2006. It was then that the district court denied the government's first motion to reconsider as well as its supplemental motion to reconsider. To be sure, the district court invited the government to file a second motion to reconsider, but there ought to be no question that the court rejected the government's first (and supplemental) motion. The May 17, 2006 order, after all, (1) specifically refused to entertain the government's good-faith argument; (2) denied reconsideration in pertinent part; (3) refused to vacate the court's existing final judgment; (4) invited the government not to file a supplemental brief on good faith, but a *new motion*. On top of all this, (5) the government understood its subsequent, May 18 filing

-6-

amounted to just such a successive, second motion for reconsideration, and (6) far from being assured it was on *terra firma* like Mr. Bowles, the government was expressly warned by the district court that it proceeded at its "own risk" with respect to filing a timely notice of appeal. With the district court's denial of the government's initial (and supplemental) motion for reconsideration, the government had until June 16, 2006 (at the latest) to file its notice of appeal. Because it did not do so until June 29, 2006, its appeal is untimely and we are without jurisdiction to hear it.

In response to all this, the government, unsurprisingly, does not argue that the court's May 17, 2006 order was only a preliminary or tentative ruling on its initial and supplemental motions. Rather, the government readily acknowledges that the district court denied these motions in relevant part and that it was forced to file a second motion on May 18.[3] Before us, the government presses only equitable

---

[3] The cases cited by the court for its conclusion otherwise seem to me inapplicable. For example, in *United States v. Karo*, 710 F.2d 1433, 1436 (10th Cir. 1983), *rev'd on other grounds*, 468 U.S. 705 (1984), we simply held that an oral ruling on a motion to suppress was not a final, appealable order when the district court expressly indicated that a formal, written ruling would be forthcoming. In *S. Ute Indian Tribe v. Amoco Prod. Co.*, 2 F.3d 1023, 1029 (10th Cir. 1993), likewise, the district court signed a pre-prepared case management order but expressly "declared that it was doing so preliminary and would enter a more detailed written order." *See also Fiataruolo v. United States*, 8 F.3d 930, 937 (2d Cir. 1993) (holding that a written judgment for the plaintiff *was* final even when the district court had yet to specify a dollar award); *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1208-09 (10th Cir. 1992) (the district court's contempt order specified that plaintiffs could discharge the contempt by meeting certain conditions and expressly indicated that the court would consider further argument at a later date on that issue); *Taylor v. Cont'l*

(continued...)

excuses for its delay in filing a notice of appeal. Specifically, the government (1) stresses its belief that its second motion for reconsideration raised important new arguments; (2) notes that it had the permission of the district court to file a second motion for reconsideration; (3) seeks to assure the court that its successive motion was not interposed for reasons of delay; and (4) argues that waiting to start the appellate clock ticking until a final motion for reconsideration can be resolved facilitates judicial economy by avoiding piecemeal appeals. *See* Gov't Br. at 3-9.

None of the government's equitable arguments may be entirely without appeal. But each contains obvious weaknesses,[4] and none is remotely as strong as Mr. Bowles's equitable argument that he had relied on the word of a federal court in delaying his notice of appeal. Even more to the point, however, the Supreme Court has unequivocally directed that jurisdictional filing deadlines are not susceptible to

---

[3](...continued)
*Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1231 n.2 (3d Cir. 1991) (holding that the time for appeal does not run from a *vacated* district court order). By contrast, even the government does not dispute that the district court in this case denied its initial (and supplemental) motion to reconsider in relevant part, thus necessitating a second motion.

[4] For example, while the government did raise new points in its May 18, 2006, filing in support of the application of the good-faith exception, there is no reason why it could not have raised those points much earlier in the proceedings, even during the pendency of the original motion to suppress. While the district court permitted the government to file yet another motion to reconsider, it firmly rejected the government's first and supplemental motions for reconsideration and had long made clear the government proceeded at its own risk with respect to noticing a timely appeal. As to judicial economy, one can make arguments both ways; as the Supreme Court noted in *Bowles*, a firm 30-day rule encourages "clarity" for practitioners. *Bowles*, 127 S. Ct. at 2367.

alteration based on precisely the sort of equitable considerations that the government urges on us, explaining that "this Court has no authority to create equitable exceptions to jurisdictional requirements." *Bowles*, 127 S. Ct. at 2366. And whatever else one might think about this command, it surely must be susceptible to the Rule of the Goose and Gander and thus apply no less forcefully to the government than the habeas petitioner. Accordingly, I respectfully dissent.