# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 05-3185

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GEORGE L. GOINS,

*Defendant-Appellant.*

_____

**Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05-CR-04-C—Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED JANUARY 12, 2006—DECIDED FEBRUARY 9, 2006

_____

Before FLAUM, *Chief Judge*, and BAUER and EVANS, *Circuit Judges.*

FLAUM, *Chief Judge.*  On December 8, 2004, Kalina Bratton called the police after an argument with her boyfriend, George Goins. She claimed that Goins had assaulted her, and she asked for a police escort into his home so that she could gather her belongings safely. She also told the police that she had found what she believed to be crack cocaine in Goins' apartment and that he had a gun in the apartment. She claimed that she lived at Goins' apartment, so the police entered and searched the apart-

ment based on her consent. They found crack cocaine in a coat pocket and a gun case in the location that Bratton had described. An officer opened the gun case and discovered a handgun inside.

Goins claimed that the search was unconstitutional and that the evidence from it should be suppressed. The district court ruled against Goins on this claim, finding that Bratton had apparent authority to consent to a search of the apartment and that although the officer's opening the gun case was unconstitutional, the gun should not be excluded under the inevitable discovery doctrine. Goins appeals that ruling.

For the following reasons, we now affirm.

## I. Background

Late in the evening on Dec. 8, 2004, in the city of La-Crosse, Wisconsin, Kalina Bratton telephoned the police to complain that she had just been verbally abused and kicked in the backside by her boyfriend, George Goins. Officer Jacob Jansky was dispatched to investigate. Jansky met with Bratton in the parking lot of a townhome complex on Caledonia Street. She told Jansky that Goins had kicked her and she was scared of Goins, so she wanted a police escort while she went into his home to retrieve her belongings. Jansky took Bratton to a subpolice station nearby to finish their conversation, because it was cold outside and he wished to make Bratton more comfortable.

At the substation, Bratton told Jansky that she had been dating Goins for approximately five months. She stated that she actually lived with her children in an apartment on the 900 block of Winneshiek Road, several miles away, but had been living with Goins at 1024 Caledonia Street on-and-off for several months. Bratton had a key to Goins' home. She reported that she performed household chores for Goins

such as cleaning, cooking, and doing laundry. Bratton claimed that she had clothing and household items at 1024 Caledonia and wished to get them that evening because she intended to move out.

Bratton then volunteered that Goins kept drugs and a handgun in his house. As Jansky began to inquire further into these allegations, Bratton asked to speak to Investigator Marion Byerson, naming him by name. Byerson was a veteran drug investigator with the LaCrosse Police Department.

The patrol officers called Byerson at home. Byerson already knew Goins, both personally and professionally. He did not recall having met Bratton before, but he later testified that he might have known who she was. Byerson asked the officers to put Bratton on the telephone so that he could talk with her.

Bratton told Byerson that after Goins yelled at her and kicked her, he left 1024 Caledonia while she stayed behind to clean up. She claimed that she lifted the mattress in the bedroom where she slept with Goins and saw a large quantity of cocaine in a plastic bag. She reported that Goins kept a handgun in a black case that was under the couch. Byerson believed that Goins was a convicted felon based on his knowledge of Goins' criminal history.

Bratton repeated her connection to 1024 Caledonia to Byerson: she had a key to the apartment, she had been staying with Goins for several months, and she did various household chores, including laundry, cooking, and straightening up.

Bratton's name was not on the property's lease and she did not pay rent. The magistrate judge wrote that he surmised that the police inferred both facts that evening. The judge also wrote that Byerson nevertheless "saw an opportunity to conduct a consent search of 1024 Caledonia."

Byerson directed Jansky to take Bratton back to 1024 Caledonia so she could collect her belongings, and indicated to Jansky that he would meet them there. Byerson also called Sergeant Jaholsky of the drug unit and directed him to go to the residence.

Three patrol officers took Bratton to 1024 Caledonia, where she unlocked the door with her key and allowed the officers in. They performed a protective sweep of the residence and determined that no one was home. Byerson and Jaholsky arrived and spoke with Bratton, double-checking her connection to 1024 Caledonia. Bratton showed Byerson her key, repeated that she had personal belongings in the house, and showed some of the belongings to him. She repeated that she cooked for Goins and that she had free rein of the house except for the attic, which Goins visited with his friends but would not allow Bratton to enter. She claimed that she was in the process of arranging to have her mail delivered to Goins' residence. She confirmed that she had her own apartment, but in response to Byerson's questions, repeated her claim that she had been staying with Goins for several months and would return to her own apartment only for essentials.

Byerson telephoned the district attorney's office to ask for assistance in obtaining a search warrant for Goins' apartment. The Assistant District Attorney (ADA) that Byerson spoke with advised the officers that they did not need a search warrant because Bratton had provided valid consent to search.

The officers searched the apartment. Byerson went directly to the living room, looked under the couch, and found a gun case where Bratton had indicated it would be. Based on his training and familiarity with firearms, Byerson recognized the gun case for what it was. He opened it and found a handgun inside.

The drugs that Bratton reported seeing in the main bedroom under the mattress were not there. In the bedroom, Byerson found several sandwich baggies rolled in a manner commonly used to hold marijuana, but all the baggies were empty. There was a couch at the foot of the bed with a shirt laying on it. When Byerson picked up the shirt, a bag of marijuana fell out.

Jansky searched an open closet located at the confluence of the hallway, the living room, and a door leading to a balcony. The closet was full of men's clothing. Janksy did not see anything in the closet that appeared to be women's clothing. (Jansky also had not seen women's clothing or grooming items when searching other rooms, chests of drawers, and closets.) Janksy methodically patted down the pockets of the hanging garments in the closet. While patting the pockets of a jacket, he felt a lump the size of an apple that sounded "plasticky" when he patted it. Jansky was aware that Byerson had found a bag of marijuana in the bedroom. Based on that information, as well as his experience with previous pat-downs, Jansky assumed that he was feeling the package of drugs that Bratton had described earlier. Jansky pulled the suspicious item out of the coat pocket and found that it was a bag of cocaine base wrapped in a napkin.

Meanwhile, Bratton retrieved property that she claimed was hers: a plastic garbage bag full of clothing at the top of the stairs, two sauce pans from the kitchen, a hair dryer from the bathroom, and a back massager draped over the back of a chair in the living room. In their search of the residence, the officers did not find any other female clothing, toiletries, mail addressed to Bratton, or other effects. There was no washer or dryer at 1024 Caledonia.

The police left Goins' residence before he returned. He was later charged with possession of cocaine base and being a felon in possession of a firearm. He moved to suppress the

drugs and the gun on Fourth Amendment grounds. Magistrate Judge Crocker recommended that the district court deny the motion. He reasoned that Bratton had apparent authority to consent to the search, because the officers could reasonably have believed that she had actual authority to authorize their search.[1] The magistrate judge further concluded that the "plain feel" doctrine allowed Jansky to remove the drugs from the coat pocket, since he realized what they were from his experience with pat-downs.

The magistrate judge found, however, that Bratton did not have actual or apparent authority to authorize opening the gun case. He ruled that Byerson was within constitutional bounds when he looked under the couch, because that was where Bratton had told him the gun was. It was also legitimate for him to conclude that the gun was evidence of a crime, since he knew of Goins' criminal background. Therefore, the magistrate judge found, the gun should not be excluded under the inevitable discovery doctrine, because Byerson could have seized the unopened case and inevitably would have obtained a warrant to open it.

The district court adopted the magistrate judge's recommended findings. Goins now appeals.

---

[1] Bratton did not testify at the suppression hearing. For that reason, the magistrate judge felt that the government had failed to show that she had actual authority to consent to a search of the apartment. However, he stated explicitly that it was possible that she had actual authority as well as apparent authority to authorize the search.

## II. Discussion

### A. Apparent authority to search the home

Goins claims that the government did not establish that Bratton had apparent authority to consent to the search. He claims that a reasonable person, given the information that the officers possessed, would not have believed that Bratton had the authority to consent to a search. He notes that under *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990), and *Montville v. Lewis*, 87 F.3d 900, 903 (7th Cir. 1996), law enforcement officers have a duty to inquire further as to a third party's authority to consent to a search, if the surrounding circumstances make that person's authority questionable. Goins points out questions that the police could have asked, but did not, such as whether Bratton received the key from Goins himself. Goins also claims that the police should have been suspicious of Bratton's story of living at 1024 Caledonia because (1) she admitted that she had a residence elsewhere, (2) there was no mail in her name in the home, (3) there were no children's toys and little female clothing in the home, and (4) there was no laundry machine in the home, which Goins believes indicates that Bratton could not have done his laundry as she claimed.

The government emphasizes that it was not necessary for the agents to believe that Bratton had an *ownership interest* in the property, but merely that she had "mutual use" of the property. *United States v. Aghedo*, 159 F.3d 308, 310-11 (7th Cir. 1998) (holding that an apartment owner who entered the defendant's room to clean and store personal items had actual authority to consent to search the room, because her "access and control of the room in question" gave the defendant a reduced expectation of privacy). Thus, the government argues, if it was reasonable to believe Bratton's claims, it was reasonable to believe that Bratton had actual authority to search. We agree.

Therefore we must ask two questions: (1) whether the officers should have disbelieved Bratton's story based on the information that they possessed; and (2) whether they had a duty to inquire further before accepting Bratton's representations.

Addressing the latter question first, this was not a case of officers blindly accepting a person's claim of authority over a premises in order to create apparent authority to search. Several officers questioned Bratton regarding her access to the apartment, and her answers remained consistent. She had a key to the apartment, possessions within the apartment, and represented that she lived there on-and-off and frequently cleaned and did household chores in the home. She also claimed that she was allowed into Goins' residence when he was not home. These representations paint a believable and reasonably complete picture of Bratton's actual authority to search. Byerson's telephone call to the ADA further demonstrates the officers' good faith.

An officer is entitled to conduct a search without further inquiry if "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriguez,* 497 U.S. at 188 (quoting *Terry v. Ohio,* 392 U.S. 1, 21-22 (1968)) (internal quotation marks omitted). We believe that the police took sufficient precautions to assure themselves of the truth of Bratton's statements, and a reasonable person would have believed that Bratton had authority over 1024 Caledonia. *See United States v. Rodriguez,* 888 F.2d 519, 523 (7th Cir. 1989) (estranged wife who possessed key to locked closet that was actually the property of her estranged husband had apparent authority to authorize search); *see also United States v. Gillis,* 358 F.3d 386 (6th Cir. 2004) (police reasonably relied on girlfriend's apparent authority based on her representations and her detailed description of the interior of her boyfriend's home, even though police knew she had her own

residence in public housing and she did not have a key to the boyfriend's home). Consequently, the officers here fulfilled their obligation to inquire about Bratton's connection to 1024 Caledonia. *Montville*, 87 F.3d at 903.

We also believe that the evidence provided adequate support for Bratton's respresentations. Goins' claims to the contrary are unavailing. The apartment's lack of a washing machine should not have caused the police to disbelieve that Bratton did Goins' laundry. The police could reasonably assume that Bratton took Goins' laundry elsewhere, just as Goins himself would have had to do. More probative were the pans that Bratton grabbed, indicating that she had actually cooked at Goins' apartment. Additionally, the dearth of children's toys does little to indicate that Bratton herself was not at the home often, as the record is unclear about the age of Bratton's children and whether other people assisted in their care. Although Goins makes much of the fact that no female clothing was hanging in the closets of the home, Bratton did remove an entire plastic garbage bag of female clothing from the home. This much clothing could indicate that Bratton stayed at Goins' home regularly.

The officers, then, were entitled to accept Bratton's statements as true and could have reasonably believed that she had actual authority to consent to a search.

## B. Inevitable discovery of the gun

Once we have determined that the officers were legally inside the apartment, the unopened gun case is clearly within the purview of the constitutional search. Our inquiry cannot end here, however, for we must determine whether the gun itself must be suppressed because Byerson opened the gun case without a warrant or valid consent. The magistrate judge found that Bratton did not have actual or

apparent authority to consent to opening the case, and the government does not contest that finding on appeal. In order for the gun to be admissible evidence, then, it must fall under some exception to the exclusionary rule.

The magistrate judge ruled that the gun is admissible under the inevitable discovery doctrine. In the district court's view, Byerson knew that the object he discovered under the sofa was likely a gun case from his experience as a police officer; he also knew that the gun likely belonged to a convicted felon. These factors combined gave him appropriate probable cause to obtain a warrant. Byerson would also have been within his rights to seize the gun case and its contents until the warrant had been granted. Therefore, the court ruled, the inevitable discovery doctrine would excuse Byerson opening the gun case prematurely.

We agree with this analysis. "Whereas the exclusionary rule deprives the prosecution of evidence tainted by official wrongdoing and thereby discourages future improprieties, the inevitable discovery exception to the rule permits the introduction of evidence that eventually would have been located had there been no error . . ." *United States v. Jones*, 72 F.3d 1324, 1330 (7th Cir. 1995). Absent Byerson's error, we are confident that the gun would eventually have been legally discovered. *See United States v. Buchanan*, 910 F.2d 1571 (7th Cir. 1990) (holding that where probable cause to obtain a warrant existed and the police inevitably would have applied for a warrant, the inevitable discovery doctrine applied). Exclusion under these circumstances would be inappropriate.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of defendant's motion to suppress evidence.

No. 05-3185                                                          11

A true Copy:

   Teste:


                              _____
                              *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*