In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1654

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RICHARD RYERSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06 CR 172—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 12, 2007—DECIDED SEPTEMBER 18, 2008

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Defendant Richard Ryerson challenges his conviction and sentence for possessing a machine gun in violation of 18 U.S.C. § 922(o). Ryerson claims the district court improperly denied his motion to suppress the machine gun, which was found in Ryerson's garage after his ex-wife, Jennifer Lawicki, consented to a warrantless search. Ryerson also contends that the court improperly enhanced his sentence by two levels for obstruction of justice.

Although this is a close case, we are not persuaded by Ryerson's arguments. Because of Lawicki's long-term and continuing residence in Ryerson's home, she had authority to consent to the search and the police acted reasonably in believing she lived there. The district court also had ample reason to enhance Ryerson's sentence for obstruction of justice because he tried to dump the machine gun before he was caught. Therefore, we affirm Ryerson's conviction and sentence.

## I. BACKGROUND

On February 8, 2006, Jennifer Lawicki went to the sheriff's office in Adams County, Wisconsin, to try and regain custody of her infant daughter. Lawicki explained to the officers that she lived with her boyfriend Richard Ryerson and their daughter in a home on Gillette Lane in Adams County, even though she filed a missing person/runaway report that listed a different home address on Gale Drive, also in Adams County. Lawicki was accompanied by Dave Curley, with whom she was staying at the Gale Drive residence. Lawicki told the police that Curley was just a friend and that she was not romantically involved with him.

Lawicki stated that she had left Gillette Lane three days earlier after an argument with Ryerson and had returned to get her daughter and their belongings. She claimed she could not enter her home because Ryerson (who was jailed in Adams County because he had traveled to Illinois in violation of his probation) had changed the locks while she was away. A sergeant told Lawicki she could break a window to enter the home so long as she lived there. So

Lawicki did just that. Jason Krumscheid, an employee of Ryerson's entrusted to care for the house, saw the broken window and reported a burglary to the police.

The next day, the police arranged to interview Lawicki back at the sheriff's office regarding the alleged burglary. Once again accompanied by Curley, Lawicki repeatedly told Investigators Mark Bitsky and Todd Laudert that she lived at Gillette Lane. She also said that Ryerson sold drugs and stored weapons at Gillette Lane, including a submachine gun that she had allegedly seen two months earlier under the back porch. Bitsky asked Lawicki if the police could search the home for contraband. After consenting, she signed a permission to search form.

The police followed Lawicki and Curley to Gillette Lane. The officers summoned Jason Krumscheid, who willingly let Lawicki and the police enter the home. Little did they know that Ryerson had called Krumscheid from jail earlier that evening, expressing concern that Lawicki might plant something because she "has access to the house" and noting that "[a]nything in that house could be Jennifer's also." He asked, "What's to stop her from going in there and planting cocaine or something all over my house?" Additionally, Ryerson mentioned that Lawicki had a restraining order preventing him from coming within 100 feet of her. He also directed Krumscheid to get rid of "a little rapid fire BB gun" stashed in the garage drywall, along with some jewelry that Lawicki had allegedly hidden there.

Before entering, Lawicki correctly anticipated and warned the police about a "vicious cat" inside the house. She said that the house was in Ryerson's name, but that she

had bought the property with him and lived there with their baby. Lawicki also went to the basement to retrieve some business records for the Dells Cab Company, a taxicab company that Ryerson and Lawicki co-owned and ran from Gillette Lane. The house also contained Lawicki's and her baby's personal items, including clothes and toys. The officers further found a pellet gun, ammunition, a digital scale with white powdery residue, and a pack of rolling papers. They did not find a machine gun or any drugs.

Meanwhile at Adams County jail, Ryerson complained of a heart condition. Although it turned out he was merely agitated, Ryerson was fretting that Lawicki had "broken into" his home and was planting evidence there. He handed a jail sergeant a note that read:

> Dear Sargent, my name is Richard Ryerson, my x wife took my baby to an undisclosed location out of state and told me I would never see her, so I crossed Ill boarded without permission; that why Im her; while I was in here she broke in the house I took lots of stuff. The House is in my name I just bought it.

> We have been divorest for 3 years, she dosn't have any name on the house, it is souly mine, she just stays with me as girl friend now. MY PO Jill Edward and I our concern of her planting eleagl things in the House, my cab Drive stays At my resdence while Im in her. My X girlfriend is sit out in front of my drive way with her know boyfriend he is a Drug Dealer and I think when they broke

> in last knight they put some thing in my house or they want to go back in and do somthing to night.
>
> Please may I talk to you ASAP
>
> Rick Ryerson
>
> Dells Cab Co
>
> CEO

The record does not indicate whether the jail sergeant read the note before handing it to Investigator Bitsky after he returned from the search. Bitsky did not read the note until after the relevant events had occurred in this case.

The next morning, Bitsky listened to the jail's recording of Ryerson and Krumscheid's conversation from the previous evening. Bitsky recognized that an illegal weapon still might be hidden in the garage drywall and asked Lawicki to meet him at Gillette Lane. She signed another permission to search form and accompanied the officers into the garage. Lawicki did not object when they used a thermal imager to search for "dead spots" in the wall. In a second dead spot, the police recovered a Thompson submachine gun.

After his indictment, Ryerson moved to suppress the machine gun as the fruit of an illegal search. At an evidentiary hearing before a magistrate judge, Lawicki (who had since remarried Ryerson) testified that she did not believe she had legal authority to consent to the searches. The magistrate judge did not buy her testimony and recommended the district court deny Ryerson's motion. Ryerson then pled guilty, preserving his right to challenge the

denial of his motion to suppress. The district court adopted the magistrate's recommendation and sentenced Ryerson to 48 months in prison, imposing a two-level enhancement for obstruction of justice.

## II. ANALYSIS

### A.  Ryerson's motion to suppress was properly denied.

Ryerson claims the police violated his Fourth Amendment rights when they searched his home on February 9, 2006, and searched his garage the next day. The government successfully argued before the magistrate judge and the district court that Lawicki's consent justified both of these warrantless searches. We review the district court's factual findings for clear error and questions of law de novo. *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006).

Although a third party generally cannot consent to a warrantless search of another's home, there is an exception when the government can show by a preponderance of the evidence that the third party "possessed common authority over, or other sufficient relationship to, the premises or effects sought to be inspected." *United States v. Brown*, 328 F.3d 352, 356 (7th Cir. 2003) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)) (internal quotation marks omitted). This "actual authority" does not depend on property law distinctions but instead rests on whether there is "mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7; *see also United States v. Denberg*, 212 F.3d 987, 991 (7th Cir. 2000).

We agree with the government that Lawicki had actual authority to consent to both searches. Lawicki was Ryerson's ex-wife and then-current girlfriend (and now-current wife). Although Lawicki was staying with Curley at the time of the search, she told the police that her relationship with him was not romantic (even though she later referred to him as her "boyfriend" at the suppression hearing). At any rate, she had lived at Gillette Lane with Ryerson and their infant daughter for ten months before the search, a significant period of time. *See Denberg*, 212 F.3d at 991 (having one's children live at a residence suggests authority to consent). Ryerson does not claim that he kicked her out of the house; rather, she appears to have left on her own accord after a tiff with him. And although Lawicki claimed at the evidentiary hearing that she had not intended to return, she only took an overnight bag when she left. Even if she was moving out, she had not yet done so at the time of the search. As the officers noticed, Lawicki left many of her and her baby's belongings in the home. *See United States v. Goins*, 437 F.3d 644, 647-49 (7th Cir. 2006) (keeping clothing or personal belongings at a residence suggests authority to consent).

Moreover, Lawicki remained connected to the home through her co-ownership of the Dells Cab Company. There is no evidence that Lawicki had quit her managerial role or sold her stake in the company before the search. So Lawicki still had a right to access the company records kept in the basement of the house. *Cf.* Wis. Stat. § 178.16 (2007) ("[P]artnership books shall be kept, subject to any agreement between the partners, at the principal place of

business of the partnership, and every partner shall at all times have access to and may inspect and copy any of them."); Wis. Stat. § 183.0405(2) (2007) ("[A] member may . . . inspect and copy during ordinary business hours any limited liability company record required to be kept [at its principal place of business]"). This right of access, by itself, would not have given Lawicki the power to consent to entry into the home. But combined with Lawicki's long-term and continuing residence at Gillette Lane, we conclude Lawicki had a sufficient relationship to the home to have actual authority to permit the searches. *See United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988) (wife who had recently moved out of an apartment but still kept a key and stored personal belongings there maintained mutual use); *United States v. Crouthers*, 669 F.2d 635, 643 (10th Cir. 1982) (wife who testified she had moved out of an apartment still had actual authority to consent because she had not "abandoned" the apartment and there was a lack of evidence on the extent to which she had moved out).[1]

---

[1] Jason Krumscheid's consent is an alternate (and even stronger) basis to justify the first search on February 9. Ryerson had given Krumscheid the keys to the house and asked him to take care of the premises. That authorized Krumscheid to consent to a search, which is precisely what he did by letting the police enter the house. *See United States v. Jones*, 335 F.3d 527, 531 (6th Cir. 2003) ("A caretaker left in charge of a home for several weeks, for example, might have authority to permit entry, while a worker who is present on a more limited basis would not.").

(continued...)

Ryerson claims, however, that he revoked Lawicki's actual authority after she "moved out." But the record suggests no such thing. Although Ryerson stated in his note to the jail sergeant that the house was "souly [sic] mine" and expressed concern that Lawicki might plant evidence in the house, he also admitted that "she just stays with me as girl friend [sic] now." If anything, this suggests Ryerson still considered Lawicki a lawful co-habitant at the time of the searches. Similarly, in his taped conversation with Krumscheid, Ryerson admitted that Lawicki continued to have "access to the house" and noted that "[a]nything in that house could be Jennifer's also." By opening his home to Lawicki, Ryerson assumed the risk that she might consent to a search because "[o]ne who shares a house or room or auto with another under-stands that the partner may invite strangers—that his privacy is not absolute, but contingent in large measure on the decisions of another." *United States v. Chaidez*, 919 F.2d 1193, 1202 (7th Cir. 1990). That risk remained so long as Lawicki continued to access, use, or control the prop-erty. *See Matlock*, 415 U.S. at 171 n.7.

Although Ryerson now claims that he revoked Lawicki's authority, the fact remains that he allowed Lawicki to live there, with their child, for the ten months preceding the search. At the time of the search, Lawicki continued to

---

(...continued)

But the government somehow overlooked this argument—it was only raised by us at oral argument—so the argument was waived. *See United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007).

use the property to store her personal belongings and records for her co-owned business. So Ryerson assumed the risk that Lawicki would return, as she did. Indeed, it's possible that this is exactly what he wanted, since Ryerson later remarried Lawicki.

But what about the locks? If Ryerson changed them, perhaps he was trying to rid himself of the risk that Lawicki would return. The magistrate judge and district court never resolved whether the locks had been changed, presumably because the record was so muddled on this issue. Contrary to what Lawicki had told the police on February 8, she was adamant at the evidentiary hearing that she could not enter the house because she had not taken the keys, not because the locks were changed. So the record does not suggest that Ryerson limited Lawicki's access to the home in this manner.

Ryerson also twists this argument a bit and claims his note and comments to the jail sergeant amounted to an objection under *Georgia v. Randolph*, 547 U.S. 103 (2006), that invalidated Lawicki's consent. *Id.* at 122-23 (a physically present inhabitant may successfully object to a search over the consent of a co-habitant). Ryerson admits it's a stretch to apply *Randolph* since he was not present during either search, but he suggests *Randolph* should still apply because his absence was due to the "state," which had jailed him on a probation hold. Even if this were a tenable argument, and Ryerson's note and comments amounted to an objection, nothing in the record suggests the "state" arrested Ryerson to prevent him from objecting while the police searched his house.

Indeed, the police officers decided to search the home only after they had spoken to Lawicki, which occurred after Ryerson had already been jailed. *See id.* at 121 (noting that a non-present objector does not does not benefit under the *Randolph* rule "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection"); *see also United States v. Henderson*, No. 07-1014, 2008 WL 3009968, at *1 (7th Cir. Aug. 6, 2008).

In addition to actual authority, the second search (which is when the police found the gun) was lawful on the basis of "apparent authority." Such authority exists when the facts available to an officer at the time of a search would allow a person of reasonable caution to believe that the consenting party had authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990); *Goins*, 437 F.3d at 649 (an officer can conduct a search without further inquiry if, based on facts known to the officer, a reasonably cautious person would believe the third party had authority to consent). Here, the circumstances preceding the second search suggested Lawicki was a lawful resident of Gillette Lane. Although Lawicki claimed she was locked out of the home, Ryerson's agent Krumscheid readily allowed the police and Lawicki to enter when they first searched the premises, which could have suggested to the police that Krumscheid recognized Lawicki as a legitimate resident of the house. During the first search, the police also observed personal items indicating that Lawicki still used the home. And Lawicki's prescient warning about the ferocious kitty demonstrated her intimate

knowledge of the house. She was even familiar enough with the basement that she easily located her company's business records there. Lawicki's facility in guiding the officers through the home, and the evidence indicating that she still lived there, made it reasonable for the police to believe she could consent to the second search of the home.

Ryerson's note to the jail sergeant also had no impact on Lawicki's apparent authority because Investigator Bitsky did not read the note before the second search. Contrary to Ryerson's claims, there is no evidence that this was "willful ignorance," and at any rate, the note does not suggest Lawicki lacked the ability to consent to a search. Even though Ryerson expressed his fear that Lawicki would plant evidence, he indicated that she lived with him as his girlfriend, which suggested that she still had a right to access the house. *See United States v. Gillis*, 358 F.3d 386, 388, 391 (6th Cir. 2004) (a girlfriend who had removed her child, been locked out, maintained a second residence, and had no personal property remaining in the home still had apparent authority to consent because she had claimed continued use and demonstrated her detailed knowledge of the premises).

It was also reasonable for the officers to believe that Lawicki's written consent extended to the garage given that the consent form authorized the police to search the "residence (or other real property)" at Gillette Lane. *See United States v. Evans*, 27 F.3d 1219, 1231 (7th Cir. 1994) (finding that a general consent form to search the whole premises covered the garage). And Lawicki knew the police would search the garage since that is what they told

her they would search. *See United States v. Hines*, 387 F.3d 690, 695 (8th Cir. 2004) (measuring scope of consent by objective reasonableness). That the police used a thermal imager during the search does not negate Lawicki's consent since she was present and did not object to its use. *See Evans*, 27 F.3d at 1231 (finding adequate consent where an owner did not protest when the police began to search the garage).

Instead of countering this evidence, Ryerson asks us to plod through a series of ten factors from our decision in *United States v. Groves*[2] to determine whether apparent authority exists. But *Groves* did not create a ten-factor test—indeed, a test with that many variables would allow a court to justify virtually any outcome. *Groves* merely collected some relevant factors from previous cases and emphasized that the decision did "not mean to suggest that district courts should use this as a checklist of factors in determining actual or apparent authority." *Id.* at 509

---

[2] 530 F.3d 506, 509-10 (7th Cir. 2008) ("(1) possession of a key to the premises; (2) a person's admission that she lives at the residence in question; (3) possession of a driver's license listing the residence as the driver's legal address; (4) receiving mail and bills at that residence; (5) keeping clothing at the residence; (6) having one's children reside at that address; (7) keeping personal belongings such as a diary or a pet at that residence; (8) performing household chores at the home; (9) being on the lease for the premises and/or paying rent; and (10) being allowed into the home when the owner is not present" (quoting *United States v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006) (citations omitted)) (internal quotation marks omitted)).

(quoting *United States v. Groves*, 470 F.3d 311, 319 n.3 (7th Cir. 2006)) (internal quotation marks omitted). At any rate, the district court found that at least four of the *Groves* factors (2, 5, 6 and 7) were present here and Ryerson has not demonstrated that those factors do not establish apparent authority.

### B.  There was no clear error for the obstruction of justice enhancement.

A district court may increase a defendant's offense level if he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." United States Sentencing Commission Guidelines Manual (U.S.S.G.) § 3C1.1 (2006). This conduct includes "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding." *Id.* cmt. n.4(d). We review the district court's factual finding for clear error. *United States v. Davis*, 442 F.3d 1003, 1008-09 (7th Cir. 2006).

Ryerson asked Krumscheid to dispose of the machine gun hidden in the garage drywall. Ryerson claims he was merely "seeking to dispossess himself of contraband . . . consistent with the purpose of the law—to cease unlawful activity." He characterizes his actions very charitably. The district court was justified in reaching another conclusion: Ryerson was trying to dump the gun before  he got caught. If Ryerson were serious about surrendering the gun, he would have told a police officer at the

jail. Instead he wrote a misleading note about how Lawicki might try to plant evidence that he himself had hidden. It is hardly credible that Ryerson suddenly repented for his illegal conduct right around the time he learned his house might be searched.

Ryerson also cites to various cases to argue that an obstruction of justice enhancement cannot apply here. But those cases involve either false statements (U.S.S.G. § 3C1.1 cmt. n.4(g); *United States v. Kroledge*, 201 F.3d 900, 905-08 (7th Cir. 2000)) or concealment of evidence contemporaneous with arrest (U.S.S.G. § 3C1.1 cmt. n.4(d); *United States v. Perry*, 991 F.2d 304, 311-12 (6th Cir. 1993); *United States v. Savard*, 964 F.2d 1075, 1079 (11th Cir. 1992)), which are circumstances that are materially different from the present case. Ryerson's directive to Krumscheid to get rid of the gun is precisely the kind of conduct that the obstruction of justice enhancement was intended to deter.

### III.  CONCLUSION

The judgment of the district court is AFFIRMED.