In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1805

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

VICTOR GARCIA,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CR 176-2—**Amy J. St. Eve**, *Judge*.

ARGUED AUGUST 7, 2012—DECIDED AUGUST 27, 2012

Before POSNER, TINDER, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant pleaded guilty to attempting to possess cocaine, intending to distribute it, and was sentenced to 120 months in prison. He had given a person who, unbeknownst to him, was working with the federal Drug Enforcement Administration $477,020 for 32 kilograms of what he thought was cocaine (it wasn't). After arresting him officers searched his apartment and found 13 kilograms of real cocaine. He hasn't been prosecuted for that possession although he

could have been because the five-year statute of limitations had not yet run. He challenged the legality of the search because he feared that the government might use the 13 kilograms against him at trial to bolster its case of attempt; the government did not deny that it might. His agreement to plead guilty provided that he could challenge the search and entitles him if the challenge succeeds to withdraw his plea of guilty. Apparently he thinks that in a trial he might be acquitted of attempted possession if the 13 kilograms of real cocaine were kept out of the case.

The district judge conducted a suppression hearing and denied the defendant's motion to suppress after making the following findings:

When the defendant was arrested, officers found a piece of paper with an address on it and went to the address. It turned out to be the home of the defendant's sister and her daughter, the defendant's 18-year-old niece. The defendant's son, a child of 8, was also present. The child's mother lived in California, and the child lived with his father in an apartment in the same apartment complex (in Palatine, Illinois) as the aunt and niece.

Two of the officers who had gone to the relatives' apartment testified at the suppression hearing. They gave essentially the same testimony: They had interviewed the two women, and the niece had told them that because the defendant was often not in his apartment during the day or even the night, she made sure that the child got to school in the morning and sometimes would wait for him in the defendant's apartment when the child came home from school if the de-

fendant wasn't expected to be at home. She said the defendant had given her or her mother a key to the apartment and she had unlimited access to it to take care of the child—get him ready for school, let kids into the apartment to play with him in her presence, and so forth. She was willing to allow the officers to search the apartment and told them she thought she was authorized by the defendant to allow people to enter and look through it. She signed a form they handed her, consenting to the search, and led them to the apartment and opened the door for them. They found the 13 kilograms of cocaine in 13 packages in a closet.

The niece's testimony at the suppression hearing contradicted the officers on key points, but the judge disbelieved her, as she was entitled to do, especially since the niece had an incentive to testify favorably to her uncle. So the question is whether the facts as we have recited them show that the officers had a reasonable belief that the niece had been authorized to allow a search of her uncle's apartment. *Illinois v. Rodriguez*, 497 U.S. 177 (1990).

We note parenthetically that having arrested the defendant the police could of course have obtained a warrant to search his apartment and could have prevented anyone from entering until they had procured and executed it. Undoubtedly they would have done those things had they not based the search on the niece's consent. That may well make this a case of "inevitable discovery," excusing the lack of any lawful basis for the search that was actually conducted. But the govern-

ment doesn't argue inevitable discovery, and so we'll confine our analysis to whether the search was supported by valid consent.

The question of the authority of someone not the occupant of a home to consent to a search of it arises frequently but has never received a crisp general answer and probably never will. The courts typically ask whether the nonoccupant who consented had "common authority [that is, authority in common with the occupant] over or other sufficient relationship to the premises" to allow the nonoccupant to consent to a search. *United States v. Matlock*, 415 U.S. 164, 171 (1974); *United States v. Ryerson*, 545 F.3d 483, 487 (7th Cir. 2008); *United States v. Groves*, 470 F.3d 311, 318-19 (7th Cir. 2006); *United States v. Cos*, 498 F.3d 1115, 1124 (10th Cir. 2007). This is a pretty empty formula. It restates the question rather than answering it. A little more helpful, though still vague, is another formulation in *Matlock*: "mutual use of the property by persons generally having joint access or control for most purposes." 415 U.S. at 171 n. 7; see, e.g., *United States v. Cos*, *supra*, 498 F.3d at 1125. Sharing a home is the clearest example of such joint access and control. See 4 Wayne R. LaFave, *Search and Seizure* § 8.3(a), pp. 148-49 (4th ed. 2004). But what of the common case in which someone besides the occupant or occupants of a house or an apartment or other premises—someone who does not live there (if it's a residence rather than an office)—has a key to it: a neighbor, a relative, a cleaning service, a babysitter, a dog walker, the person who feeds the cat when the homeowner is away, the building superintendent, hotel

staff (if one is staying at a hotel—and some people live in hotels), or other institutional staff (many people live in retirement or nursing homes).

If anyone with a key can permit police to search a person's home, office, hotel room, or other place of occupancy, personal privacy would be considerably diminished. Courts understandably refuse to grant the police such carte blanche. It is different, however, if an employee, relative, or neighbor is left in charge of the premises. See *United States v. Ayoub*, 498 F.3d 532, 539 (6th Cir. 2007); LaFave, *supra*, § 8.5(e), p. 235; *id*., § 8.6(c), pp. 248-49.

Difficult as it is to draw the line, we can at least mark the extremes—at one extreme a couple married or unmarried (*so* much cohabitation today is nonmarital) sharing a home. Each spouse or partner has the full run of the house. Each can let anyone in and authorize the visitor to look around—even to look in a closet. At the other extreme are the neighbor who has a key, the babysitter, the hotel staff: their authority over the place of residence is specific and limited; they are not authorized to compromise the resident's privacy beyond what they have to do to perform their authorized tasks. If such persons could authorize a police search, personal privacy would be gravely compromised because the average person would be afraid to refuse a police officer's request to let them into a house to which the person had a key, to search.

We think the facts of the present case as found by the district judge place it slightly nearer the cohabitation pole. As a single, working parent of a young child, the

defendant needed considerable help and some of it was given by his niece and aunt (particularly the former) in his home. He was fortunate in being able to turn for help to two relatives who were also neighbors of his. He was more likely to trust them than a nonrelative. He gave them the run of the apartment to take care of the child (to get clothes for the child, for example—one of the things the niece told the officers she did in the apartment). The apartment was very small—it's not as if there had been a children's wing to which the relatives could have confined themselves when attending the child. Sometimes there were other children in the apartment, invited to play with the defendant's child—the relatives were authorized to admit them.

The defendant's lawyer describes the niece as a mere babysitter. She was more than that. Although neither she nor her mother lived in the defendant's apartment, when they were there they were *in loco parentis*. Had the child's mother lived there, her authority to allow the search could not have been questioned. The defendant's aunt and niece together were not quite a surrogate mother, but neither were they just neighbors with a key. That the defendant kept a large quantity of cocaine in a closet of this small apartment suggests that he reposed an unusual degree of trust in his aunt and niece and thus had delegated to them a large measure of authority over the apartment when he was not there.

The closet, moreover, contained more than packages of cocaine—contained children's clothing, obviously the

clothing of the defendant's child. This fact supports an inference that the critical part of the apartment that was searched was within the scope of the niece's authority. Keeping cocaine in the closet was as we said indicative of the defendant's trust, in his aunt and niece. That the child's clothes were also kept in the closet further confirms that trust, since part of the niece's assignment was to see that the child "got clean clothes and . . . [got him] ready for school."

The facts of this case are thus unlike those held *not* to create authority to consent to search in the *Rodriguez* case (the Court remanded for a determination of whether other facts might have created apparent authority—that is, whether the police had had a reasonable although erroneous belief that the person who consented to the search had the occupant's authority to consent): "The evidence showed that although Fischer, with her two small children, had lived with Rodriguez beginning in December 1984, she had moved out on July 1, 1985, almost a month before the search at issue here, and had gone to live with her mother. She took her and her children's clothing with her, though leaving behind some furniture and household effects. During the period after July 1 she sometimes spent the night at Rodriguez's apartment, but never invited her friends there, and never went there herself when he was not home. Her name was not on the lease nor did she contribute to the rent. She had a key to the apartment, which she said at trial she had taken without Rodriguez's knowledge (though she testified at the preliminary hearing that Rodriguez

had given her the key)." 497 U.S. at 181. Unlike the niece in this case, who retained continuing authority over the apartment, Fischer had become simply an occasional visitor, and was merely that when she consented to the search. See also *United States v. Brown*, 328 F.3d 352, 356 (7th Cir. 2003), where the person authorizing the search "informed [the police officer] that his only connection with the apartment was that he leased it for [defendant] as a favor; [he] stated that he did not have keys to the apartment, had not paid any money for the apartment, and did not keep any belongings there." This case is much different, and on very similar facts in *United States v. Garcia-Jaimes*, 484 F.3d 1311, 1323-24 (11th Cir. 2007), abrogated in part on other grounds by *Regalado Cuellar v. United States*, 553 U.S. 550, 556 (2008), valid consent was found. The facts of the present case, as found by the district judge, establish at the least that the police had a reasonable belief that the niece was authorized to consent to the search; no more is needed to uphold the validity of the search.

AFFIRMED.