NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 9, 2014
Decided November 25, 2014

**Before**

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 13-3471

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     *Plaintiff-Appellee*, <br><br> *v.* <br><br> JOHN M. BRANDON, <br>     *Defendant-Appellant*. | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. <br><br> No. 10 CR 257 <br><br> Amy J. St. Eve, <br>     *Judge*. |

**O R D E R**

John Brandon entered a conditional guilty plea to drug and gun crimes after a Chicago police officer found a gun, cocaine, and currency inside a safe in his apartment. Brandon's girlfriend had unlocked the safe for the officer, but Brandon argued in a motion to suppress that his girlfriend did not allow the officer into the apartment or even have authority to consent to a search. The district court concluded that she could, and did, consent. Brandon challenges those conclusions on appeal. We affirm the judgment.

Chicago police officers Patrick O'Donovan and Jack DeDore encountered Brandon while investigating a 911 report that a black male in a black jacket was seen carrying a gun. Brandon, who fit that general description, was leaving his three-flat

apartment building. When told about the 911 call, Brandon denied having a gun and agreed to a pat-down, which did not turn up a weapon. Brandon said he was on his way to his car, which he pointed out. O'Donovan approached the car and, through a window, saw on the back seat a scale, surgical gloves, a surgical mask, a roll of aluminum foil, and several small foil squares. O'Donovan announced his discovery, which prompted Brandon to volunteer that he was carrying drugs in a jacket pocket. DeDore reached into the pocket and removed a small quantity of cocaine and heroin, packaged for distribution. Now under arrest, Brandon asked how he could help himself and offered to assist the officers in recovering a gun. He explained that his girlfriend, Nequila Hearnes, who was standing nearby in a bathrobe, could retrieve the gun for them. The officers placed Brandon in the back of their car and allowed Hearnes to join him there to speak privately. Brandon then told O'Donovan that Hearnes would go inside and retrieve the gun.

O'Donovan spoke briefly with Hearnes, who went into the ground-floor apartment with the officer following. O'Donovan watched as Hearnes unlocked a safe and removed a revolver. O'Donovan took the gun and also removed from the safe two plastic grocery bags, one holding $19,000 in currency and the other, powder and crack cocaine. Brandon was taken to the police station; Hearnes remained at the apartment and went to bed.

Brandon was charged with gun and drug offenses and moved to suppress the contents of the safe, including the gun. He principally argued that Hearnes had not consented to O'Donovan following her into the apartment and, anyway, lacked both actual or apparent authority to give consent. He also argued that his very offer to help the officers recover a gun was involuntary because, according to Hearnes, the police had promised to release him if a gun was turned over. Brandon's motion did not assert, however, that the police had communicated such an offer *to him*.

O'Donovan and Hearnes testified at the evidentiary hearing; Brandon did not. O'Donovan denied offering to release Brandon or promising any other reward for his cooperation. According to the officer, Brandon told him after speaking with Hearnes that she could retrieve the gun. O'Donovan then spoke to Hearnes as she stood beside the open car door. According to O'Donovan, Hearnes said that she was unfamiliar with handling guns and thus agreed that the officer could accompany her inside to retrieve the weapon. At that point, he retrieved a consent form from the trunk of his car, which he discussed with Hearnes on the porch. O'Donovan testified that she read and signed the form, which authorizes a "complete search at this time of the premises/vehicle under

my lawful control," with the address and apartment number serving as the description of the premises. O'Donovan added that he believed Hearnes resided at the address because she had emerged wearing a bathrobe at 9:00 p.m. and said that her daughter remained inside, and because Brandon's driver's license and car registration listed a different address as his residence, even though he had referred to the apartment as his home. O'Donovan did not ask Hearnes whether she lived there, whether her name was on the lease, or whether she had a key.

O'Donovan followed Hearnes into a bedroom, where she knelt down and punched in the code to a safe located in a closet. When she had opened the safe and removed the gun, O'Donovan continued, he could see one plastic bag containing what appeared to be cocaine and another bag filled with a large amount of currency. O'Donovan took the gun from Hearnes and then removed the two bags from the safe and left the apartment. He called a supervisor, Sergeant Charles Daly, and reported that Hearnes had signed a written consent to search. Daly drove to the scene, O'Donovan said, and added his name to the form as supervisor after interviewing Hearnes to verify that she had consented to the search.

O'Donovan's testimony was corroborated by Daly and ATF special agent Michael Walsh. According to Daly, Hearnes had confirmed that she lived at the apartment when he reviewed the consent form with her. Walsh likewise testified that, when he interviewed her four months after the incident, she said she had been living at Brandon's apartment.

Hearnes contradicted the officers on several points. According to Hearnes, at the time she stepped out of the apartment (but before she spoke with Brandon), the officers told her that they would release Brandon if she gave them his gun. She did not say, however, that she conveyed this purported offer to Brandon. Instead, all Hearnes said is that in the car Brandon had told her to get the gun from the safe, reminded her about the combination (which she once knew but had forgotten), and instructed her to hand over the gun. After that, Hearnes continued, she and Brandon both informed the officers that she would retrieve the gun for them, which she told O'Donovan she could handle herself. Hearnes insisted that she had entered the apartment alone and first realized that O'Donovan followed her only after she had retrieved the gun and closed the safe. O'Donovan grabbed the gun from her and demanded that she reopen the safe. She did, and he seized the drugs and money. The officers then left, taking with them Brandon, his car, insurance papers for the car, Hearnes's birth certificate, and the contraband from the safe. Then when the police returned Brandon's car between 1:30 a.m. and 2:00 a.m.,

Hearnes said, they presented her with the consent form for the very first time and asked her to sign it. They obscured the text and told her that she was signing an inventory of the seized items.

In trying to distance herself from the apartment, Hearnes testified that she never had a key before that night. ATF agent Walsh recounted, in contrast, that Hearnes had told him during an interview four months after Brandon's arrest that she did have her own key. Hearnes also testified that she had lived at Brandon's apartment "off and on" and "for a little while," that she kept clothes there, and that her daughter stayed there occasionally and also kept things there. Hearnes nonetheless maintained that she had lived primarily at a different address with her parents and her other children. In her 2010 interview with Walsh, however, Hearnes had acknowledged living at the apartment. Additionally, the government played recordings of phone conversations she had with Brandon and his mother when Hearnes was imprisoned in 2010 for a parole violation. The recordings show that she had lied to the grand jury when she denied that Brandon had talked to her about the night of his arrest, and that his mother had urged Hearnes to say that she did not live at the apartment and coached other aspects of her testimony. Hearnes also admitted to having four felony convictions.

The district court found O'Donovan to be "highly credible and significantly more credible" than Hearnes. The court relied on the officers' corroborative testimony, Hearnes's "willingness to lie to law enforcement and under oath," and Hearnes's demeanor throughout her testimony, during which she did not make eye contact, yawned, rolled her eyes, and "acted fidgety." Consequently, the court credited O'Donovan's and Daly's testimony that Hearnes had signed the consent form prior to the search, noting that the consent form was inventoried at the police station at 12:57 a.m., prior to the time that Hearnes said she had signed it.

The district court also concluded that Hearnes had actual authority to consent to the search of the apartment and the safe. The court reasoned that Hearnes had admitted to Walsh that she lived at that address and possessed a key to the apartment, that she had told Daly that she lived there when he arrived at the apartment, and because she kept her birth certificate at the apartment and ultimately admitted that she had lived there "off and on" prior to the search. The court also concluded that, even if Hearnes did not have actual authority to consent to a search of the apartment, she had apparent authority to do so because the officers had seen her exit the apartment wearing a bathrobe around 9:00 p.m., she was Brandon's acknowledged girlfriend and thus unlikely to be a one-time guest, the different address on Brandon's driver's license

suggested that he might be the visitor instead of Hearnes, and she signed the consent form authorizing a "complete search" of the premises.

Finally, the district court concluded that Brandon had failed to develop his contention that a promise of leniency in exchange for a gun would warrant suppression. In any event, the court noted, the evidence does not support a finding that the police "promised anything to him or Hearnes."

After his motion to suppress was denied, Brandon pleaded guilty to possessing powder and crack cocaine with intent to distribute, 21 U.S.C. § 841(a)(1), and possessing a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1). He was sentenced to a total of 240 months' imprisonment.

On appeal Brandon argues that the district court erred in crediting O'Donovan over Hearnes in finding that she consented to the search. Much of that argument focuses on facts that, in Brandon's view, impeached O'Donovan to the point that he was "no more credible than Hearnes." But nothing in the record suggests that the district court clearly erred, especially in light of the deference afforded district courts in making credibility determinations. *See United States v. Jackson*, 598 F.3d 340, 344 (7th Cir. 2010).

Brandon also challenges the district court's conclusion that Hearnes had actual or apparent authority to give consent. The existence of actual or apparent authority are mixed questions of law and fact, which we review de novo. *United States v. Richards*, 741 F.3d 843, 850 (7th Cir. 2014); *United States v. Gevedon*, 214 F.3d 807, 810 (7th Cir. 2000). A third party has actual authority to consent to a search of another's home when the third party possesses common authority over or joint access or control of the property. *United States v. Ryerson*, 545 F.3d 483, 487 (7th Cir. 2008); *United States v. Garcia*, 690 F.3d 860, 862 (7th Cir. 2012). Cohabiting partners typically have "the full run of the house" and may "let anyone in and authorize the visitor to look around." *Garcia*, 690 F.3d at 862–63; *see also Ryerson*, 545 F.3d at 487; *United States v. Denberg*, 212 F.3d 987, 991–92 (7th Cir. 2000).

The district court found that Hearnes was Brandon's girlfriend and had lived with him for over a month before the search. Hearnes previously had told investigators that she lived at the apartment, and even while trying to imply the opposite while testifying at the suppression hearing, Hearnes admitted that she had lived at the apartment "for a little while," that she kept her birth certificate there, and that she and a daughter both spent nights and kept clothes there. Brandon emphasizes, though, that Hearnes was not a party to the lease and did not pay rent, that no mail addressed to her

was found at the apartment, that she had no forms of identification with that address, and that most of her children resided elsewhere. None of these factors undercut the finding that Hearnes was living at the apartment with Brandon, even if for free and while her mother cared for her children. And it is no surprise that Hearnes did not sign the lease or change her address on forms of identification; she had been paroled to her mother's address, and apparently she was violating her parole by living at Brandon's apartment. We agree with the district court that Hearnes had actual authority to consent, and thus we need not discuss the question of apparent authority.

Brandon also argues that the police officers "consciously avoided" getting his consent, thus rendering the search unreasonable. But Hearnes and O'Donovan first conversed next to the open door of the car where Brandon sat, and Hearnes signed the consent form on the porch only because she had started walking back toward the house when O'Donovan went to retrieve it. And while a "physically present" defendant who "expressly refuses" to grant consent renders any subsequent search of a premises unreasonable as to him, this narrow exception does not apply where the defendant's absence from the consent colloquy is the result of "lawful detention or arrest." *Fernandez v. California*, 134 S.Ct. 1126, 1129–30, 1134 (2014); *see also* United States v. Wilburn, 473 F.3d 742, 744, 745 (7th Cir. 2007) (declining to apply exception to defendant who was lawfully arrested and placed in back seat of police car, forty feet from where defendant's girlfriend consented to search of their apartment).

Brandon also contends that Hearnes lacked authority to consent to a search of the safe, and that O'Donovan did not see the drugs and money in the safe in plain view once it was opened. But Hearnes's consent was unnecessary because the contraband was in plain view. *See Horton v. California*, 496 U.S. 128, 133–34, 133 n.5 (1990) (clarifying that the observation of an article in plain view does not qualify as a search). And O'Donovan's testimony that the drugs and money were in plain view once the safe was opened went uncontested.

Brandon's final argument, that O'Donovan falsely promised either immunity or leniency to Brandon if he turned over a gun to the officers, borders on frivolous. Brandon did not testify at the hearing, and Hearnes did not testify that she told Brandon about the officers' purported promise to her. O'Donovan's statement in response to Brandon's offer, "Well, how are you going to do that?" does not constitute a false promise that could render a subsequent statement involuntary. *See United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009).

AFFIRMED.